RIVER PARK, INC., *et al.*, Plaintiffs-Appellants, v. THE CITY OF HIGH-LAND PARK, Defendant-Appellee.

Second District No. 2—95—0719

Opinion filed March 7, 1996.—Modified upon denial of rehearing June 12, 1996.

Donald T. Morrison and Margaret M. Borcia, both of Morrison & Morrison, P.C., of Waukegan, for appellants.

Suzanne M. Metzel and Michael K. Bartosz, both of Phelan, Cahill & Quinlan, Ltd., and William R. Quinlan, Michael I. Rothstein, and David M. Jenkins, all of Quinlan & Crisham, Ltd., both of Chicago, and John J. Zimmermann, Corporation Counsel, of Highland Park, for appellee.

JUSTICE HUTCHINSON delivered the opinion of the court:

Plaintiffs, River Park, Inc. (River Park), Spatz & Company (Spatz), and Country Club Estates, Ltd. (CCE), appeal the trial court's order dismissing their seven-count amended complaint against defendant, the City of Highland Park. The present case involves plaintiffs' attempts to have certain property rezoned for development. Defendant filed its motion to dismiss plaintiffs' amended complaint pursuant to section 2—615 of the Civil Practice Law. See 735 ILCS 5/2—615 (West 1994). In dismissing plaintiffs' amended complaint with prejudice, the trial court found, *inter alia*, that (1) plaintiffs were barred from recovering monetary damages under the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/1—101 *et seq*. (West 1994)); (2) plaintiffs' tortious interference counts failed because plaintiffs failed to show a valid business expectancy and actions on defendant's part directed towards third parties; (3) counts II (breach of contract), III (malfeasance), and IV (abuse of governmental power) failed to state legally recognized causes of action; and (4) count VII, requesting monetary damages pursuant to section 11—12—8 of the Illinois Municipal Code (Code) (65 ILCS 5/11—12—8 (West 1994) ("Failure to act upon plat")), was barred by

section 11—12—8's requirements and the applicable statute of limitations. We affirm in part, reverse in part, and remand.

Plaintiffs essentially raise three issues. They contend the trial court erred by (1) finding that the Act barred an action seeking monetary damages against defendant; (2) dismissing each count of their amended complaint; and (3) failing to find that plaintiffs had a legally enforceable right to have the property rezoned.

The present case involves a section 2—615 motion; therefore, the following facts are drawn exclusively from plaintiffs' amended complaint. See, e.g., *In re Estate of Davis*, 225 Ill. App. 3d 998, 1000 (1992) (motion must be dispensed with "solely on the basis of the pleadings"). River Park owned the 162-acre parcel of property known as the Highland Park Country Club. Spatz, a builder and developer, purchased the capital stock of River Park. CCE subsequently purchased a portion of the 162 acres for development.

The first petition for rezoning was filed in July 1988. Spatz, as River Park's authorized agent, filed the petition before defendant's plan commission. The petition requested that the 162-acre parcel be rezoned from R-1 zoning to a planned residential development (PRD) and an R-4 residential zone. Certain portions of the parcel were to remain zoned R-6. It was during the rezoning process that Spatz purchased River Park from La Salle National Bank of Chicago (La-Salle). The purchase was partially based on a purchase money loan secured by a mortgage. This financing structure required approval of the final plats within one year; the failure to secure approval would result in default and foreclosure.

Spatz appeared before the commission "numerous times" for both preapplication hearings and to discuss the proposed rezoning. The commission discussed preapplication matters with Spatz between April 1988 and August 1988. From August 1988 to October 1988 Spatz appeared for public hearings which covered the proposed rezoning "in repetitious detail." It was during this time period that Raymond Geraci (Geraci), a member of defendant's city council, formed a "citizen's commission" designated as "Save the Open Space" (SOS). The amended complaint states SOS was formed "for the purpose of encouraging [defendant] to purchase the club parcel *for the purpose* of stopping [Spatz] from rezoning and developing the property." (Emphasis added.) Geraci appeared at city council meetings and advocated that defendant purchase the parcel to prevent plaintiffs' development.

The commission largely approved the petition for rezoning. On November 14, 1989, the commission approved the petition to rezone portions of the parcel from R-1 to R-4, to leave certain portions zoned

R-6, and to create the PRD (subject to certain modifications). The commission decided to recommend that plaintiffs' petition be approved. The commission notified defendant's city council of the recommendation on November 22, 1989.

During Spatz's appearances before the commission, "executive personnel" of defendant performed a study to determine "the economic feasibility of the purchase by [defendant] of the club parcel." This study was performed at the direction of defendant. Although Spatz was appearing before the commission, defendant did not inform Spatz of the study, make an offer for the parcel, or even apprise him defendant might be interested in purchasing the parcel. On or about January 22, 1990, the feasibility study was submitted to defendant's city council in executive session.

Defendant's city council approved the commission's recommendation and approved the preliminary development plan on January 22, 1990. Defendant's zoning ordinance required the submission of "a final development plan and final engineering plans." The plans were to be submitted first to the commission and then to the city council. This was done to demonstrate that the plans were "in conformity with the preliminary plan approved and the final engineering in accord with the applicable statutes and ordinances." Defendant's zoning ordinance requires that the city engineer review the engineering plans for all proposed developments to ensure the plans comply with all applicable ordinances, laws, and regulations. The ordinance requires that a property owner presenting a development plan must secure the city engineer's approval within "one year of the preliminary plat approval by the [c]ity [c]ouncil.". Without this approval, any development plan is deemed withdrawn.

Thus began an eight-month long struggle to have the city engineer review and approve plaintiffs' zoning plan. After receiving approval of the preliminary development plan on January 22, 1990, Spatz directed its engineers to prepare the final plans. In April 1990, three months after securing city council approval, Spatz submitted a complete set of engineering plans to the city engineer for review and approval. Despite Spatz's repeated requests:

> "the [c]ity engineer *refused to review or examine* the plans or indicate any deficiencies therein. Although often requested, the [c]ity engineer *continuously refused to meet with [Spatz and River Park] and their engineers* to explain the delay, to discuss the engineering plans, to perform any review thereof, or to discuss any insufficiencies in the plans." (Emphasis added.)

The city engineer finally met with Spatz's engineers on October 5, 1990. The engineers agreed that 95% of the site engineering plans,

with certain corrections and modifications, conformed with all city requirements. The city engineering department agreed that they would review the remaining 5% of the plans and inform Spatz and River Park of the engineering criteria required for approval. The city engineering department agreed to provide these criteria by December 1, 1990. This would allow Spatz and River Park to complete final modifications and meet their January 22, 1991, deadline. Spatz and River Park "promptly provided" the city engineer with corrected plans for the first 95% of the plans. These corrected plans satisfied all of the city engineer's comments and objections. Still, "the [c]ity [e]ngineer *refused to provide* the criteria required to complete the remaining 5% of the plans." (Emphasis added.)

December 1, 1990, came and went without the promised action by the city engineer. With the deadline looming, Spatz requested that the commission consider the zoning petition before January 22, 1991, without the city engineer's approval. The commission refused. It cited the city engineer's failure to act on the plans. "[D]uring the pendency" of the city engineer's review, an attorney for either Spatz or River Park had formally advised defendant and its engineering department that without approval of the final plats within the one year La Salle would foreclose.

On January 22, 1991, the city council withdrew their preliminary approval of the zoning and development plans. Defendant informed Spatz "that if it wished the property rezoned as previously approved, it would be required to restart the commission review process completely from the beginning."

River Park then filed for bankruptcy. As part of its reorganization plan, River Park entered into an agreement to sell 34 acres of the 162-acre parcel to CCE. This would give River Park the financing required to restart the zoning process. After obtaining the reorganization plan, plaintiffs filed a new zoning petition in March 1992. This new petition requested R-4 zoning for portions of a 34-acre tract. The remaining 128 acres would remain a golf course.

On June 23, 1992, La Salle commenced foreclosure proceedings. Plaintiffs negotiated a right of repurchase in exchange for a deed in lieu of foreclosure. This allowed plaintiffs to continue the second zoning proceeding. La Salle and plaintiffs agreed that if plaintiffs obtained the rezoning, they would have the right to redeem the property from La Salle.

Plaintiffs began the second round of zoning hearings. Plaintiffs' agents appeared before the commission on April 8, 1992; May 1, 1992; May 5, 1992; May 27, 1992; and June 2, 1992. On June 29, 1992, after the last of these hearings, the transcript of the hearings

was delivered to the commission. Under defendant's ordinance, the commission was required to vote on the second zoning petition within 45 days of June 29, 1992.

Before the 45 days ran, the commission demanded evidence that plaintiffs still owned the parcel. The commission adopted a resolution requiring plaintiffs to submit new evidence of ownership and an affidavit of title by August 11, 1992. The commission would unilaterally deem plaintiffs' petition withdrawn if they failed to supply the evidence and affidavit. Plaintiffs advised the commission it did not have the authority to demand new evidence of ownership. Plaintiffs requested the commission vote on the petition as it stood. The commission refused. Plaintiffs requested an extension, stating new evidence of title had been requested from La Salle but would not be forthcoming before the August 11, 1992, deadline. The commission refused. Despite plaintiffs' eventual presentation of evidence of title, the commission "deemed" plaintiffs' petition to be withdrawn. Plaintiffs were told they would have to start the zoning process anew for a third time.

Defendant eventually purchased plaintiffs' former property. During the pendency of the second zoning petition, defendant had been negotiating with La Salle for the purchase of the 162-acre parcel. This was done without plaintiffs' knowledge. During these negotiations defendant "was aware of plaintiffs' rights to redeem and repurchase the property if and when the rezoning was granted." Defendant purchased the property for $10 million; the purchase price was "far less than its market value." Plaintiffs believe defendant has "sold or attempted to sell substantial portions of the club property to others for residential development at a profit."

Plaintiffs filed a federal civil rights lawsuit against defendant. On April 25, 1994, the federal appellate court affirmed the district court's dismissal of the action in *River Park, Inc. v. City of Highland Park*, 23 F.3d 164 (7th Cir. 1994).

In the present case, plaintiffs filed their original complaint on November 21, 1994. The amended complaint was filed on March 15, 1995. The amended complaint contained counts alleging (1) tortious interference with business expectancy; (2) breach of implied contract; (3) malfeasance; (4) abuse of governmental power; (5) tortious interference with mortgage; (6) tortious interference with contract of redemption; and (7) violation of section 11—12—8 of the Code (65 ILCS 5/11—12—8 (West 1994)). The amended complaint prays for $25 million in damages.

■ We have recently stated the guidelines for reviewing an order dismissing a complaint pursuant to section 2—615. In *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11 (1995), we stated:

"A complaint should be dismissed under section 2—615 for failure to state a cause of action only when it clearly appears that no set of facts could be proved under the pleadings which would entitle the plaintiff to relief. (*Ogle v. Fuiten* (1984), 102 Ill. 2d 356, 360-61; *Capitol Indemnity Corp. v. S. Smith Intermediaries, Inc.* (1992), 229 Ill. App. 3d 119, 123; *Groenings v. City of St. Charles* (1991), 215 Ill. App. 3d 295, 299.) \*\*\*

A section 2—615 motion admits all well-pleaded facts as true, but not conclusions of law or factual conclusions which are unsupported by allegations of specific facts. (*Talbert v. Home Savings of America, F.A.* (1994), 265 Ill. App. 3d 376, 379.) \*\*\* In ruling on a motion to dismiss for failure to state a cause of action, the complaint's factual allegations are to be interpreted in the light most favorable to the plaintiff, but factual deficiencies may not be cured by liberal construction. *Groenings*, 215 Ill. App. 3d at 300." *Lagen*, 274 Ill. App. 3d at 16.

## I. TORT IMMUNITY ACT

Plaintiffs first contend that the trial court erred by finding that the Act barred an action seeking monetary damages against defendant. We note the trial court's order states only that the "Act bars claims for monetary damages and punitive damages." The order, therefore, does not identify the section of the Act relied on to dismiss plaintiffs' amended complaint. However, both defendant and plaintiffs assert that the trial court relied on section 2—104. With this in mind, we direct our analysis towards this section.

■ This court has consistently moved towards the position that the Act does not shield local public entities or their employees from liability for acts undertaken in bad faith or inspired by corrupt or malicious motives. We have stated that section 2—104 "does not immunize \*\*\* a public entity for enforcing or executing a law where the complaint alleges that the defendant acted wilfully and wantonly." *Firestone v. Fritz*, 119 Ill. App. 3d 685, 689 (1983). Additionally, we have held that sections 2—103, 2—201, and 2—205 "do not apply to acts resulting from *corrupt or malicious motives.*" (Emphasis added.) *Madonna v. Giacobbe*, 190 Ill. App. 3d 859, 869 (1989), citing *Idlehour Development Co. v. City of St. Charles*, 88 Ill. App. 3d 47, 52 (1980).

We note that *Madonna* involved a lawsuit filed against both the City of Wood Dale and several of its employees. *Madonna*, 190 Ill. App. 3d at 862. *Idlehour*, upon which *Madonna* relies, stated that "*[m]unicipal officers* can be liable for acts done ostensibly in the performance of official corporate duties but which are in fact an intentional misuse of the powers of the office." (Emphasis added.) *Idlehour*, 88 Ill. App. 3d at 52, citing *Young v. Hansen*, 118 Ill. App.

2d 1, 9 (1969). *Idlehour,* in turn, relied on *Young.* We recognize our decision in *Young* did not rest on a construction of section 2—104. However, *Young* did discuss Professor Baum's conclusion that acts falling within section 2—104 should not be actionable even if motivated by malice. *Young,* 118 Ill. App. 2d at 8, citing D. Baum, *Tort Liability of Local Governments and their Employees: An Introduction to the Illinois Immunity Act,* 4 U. Ill. L.F. 981, 999 (1966). In response, we stated "we are not certain that such a conclusion is warranted—particularly in view of the prior decisions of this State extending immunity in such cases only where *discretion is exercised in good faith* and not as a result of wanton or *malicious* motives." (Emphasis added.) *Young,* 118 Ill. App. 2d at 9. We are now certain such a conclusion is unwarranted.

We hold that section 2—104 does not shield a local public entity from liability based on alleged conduct that is corrupt, malicious, or otherwise undertaken in bad faith. Our holding is the logical conclusion of the process that began with *Young. Young* questioned whether section 2—104 shielded conduct that was corrupt, malicious, or otherwise undertaken in bad faith. *Idlehour* used *Young* to support its blanket statement that all municipal officers must face the consequences of their corrupt or malicious conduct. *Madonna* then cited *Idlehour* in support of the proposition that sections 2—103, 2—201, and 2—205 of the Act shield neither local public entities nor their employees from liability premised on corrupt or malicious conduct.

Our holding finds support in the decisions of other Illinois Appellate Court districts and the courts of our fellow states. The Appellate Courts for both the First and Third Districts have held that section 2—104 does not protect a local public entity from liability for acts based on corrupt or malicious motives (*Munizza v. City of Chicago,* 222 Ill. App. 3d 50, 53-54 (1st Dist. 1991)), or malicious or intentional misuses of governmental power (*City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill. App. 3d 359, 363-64 (3d Dist. 1973), citing *Young,* 118 Ill. App. 2d at 9). Additionally, several of our fellow states have held that municipalities and their officers and employees may be liable for exercising their discretion in bad faith or with fraudulent, corrupt, malicious, or wanton intent. See, *e.g., Ott v. Everett,* 420 So. 2d 258, 261 (Ala. 1982) (city, its mayor, and employees are not liable for disapproving liquor license absent allegation of fraudulent, malicious, or corrupt intent), citing *People ex rel. Schreiner v. Courtney,* 380 Ill. 171, 179 (1942); *Evon v. Andrews,* 211 Conn. 501, 505, 559 A.2d 1131, 1134 (1989) (plaintiff brought suit against city and its various employees, and court held defendants immune for discretionary acts unless it was alleged, *inter alia,* that defendants' acts involved

malice, wantonness, or intent to injure); *Gildea v. Ellershaw*, 363 Mass. 800, 820, 298 N.E.2d 847, 858-59 (1973) (public officers are immune for discretionary acts, provided they conduct themselves in good faith, without malice or corruption); *Corrao v. Mortier*, 7 Wis. 2d 494, 498-99, 96 N.W.2d 851, 853 (1959) (public officers refusing to renew taxicab permit are not liable for refusal in the absence of malicious or corrupt motive). But see, *e.g.*, *Barr v. Matteo*, 360 U.S. 564, 571, 575-76, 3 L. Ed. 2d 1434, 1441, 1443-44, 79 S. Ct. 1335, 1339, 1341-42 (1959) (interest in shielding government employees from vindictive damage suits outweighs interest in protecting individual citizens from harm caused by the oppressive, malicious, or corrupt conduct of public officials); *Richards v. Ellis*, 233 A.2d 37, 38 (Me. 1967) (public officers who deny a victualer license are immune from liability notwithstanding allegations that their denial was motivated by malice and bad faith). Finally, we note that we are obligated to construe strictly the Act against local public entities because the Act is in derogation of the common law. *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 158 (1995). This further supports our determination that section 2—104 immunizes only those discretionary decisions undertaken in good faith.

■ The complaint sets forth facts—which, in turn, give rise to inferences—capable of proving defendant acted corruptly, maliciously, or in bad faith. Defendant was aware of plaintiffs' financing arrangements and the necessity of getting zoning approval within the year. Despite this, defendant's city engineer and engineering department refused to meet with plaintiffs for six months. After meeting with plaintiffs in October 1990, defendant's city engineer agreed to give plaintiffs the information they needed to complete their plans by December 1, 1990. The city engineer failed to honor this commitment. This refusal is rendered all the more suspicious when viewed in the following context: (1) councilman Geraci and SOS had apparently lobbied defendant to purchase plaintiffs' 162 acres; (2) defendant had commissioned and received the feasibility report on purchasing plaintiffs' property prior to the petition being forwarded to the city engineer; (3) defendant knew that La Salle would likely foreclose, thereby placing plaintiffs' 162 acres on the market if plaintiffs did not secure zoning approval within the year; and (4) defendant subsequently entered into negotiations with La Salle, while still considering plaintiffs' second zoning petition, to purchase the property. Coincidence is a fact of life; however, we need not substitute blind belief in happenstance for common sense. The facts alleged in the amended complaint, if proved, could support a finding that defendant's conduct was corrupt, malicious, or otherwise undertaken

in bad faith. We hold that the trial court erred in finding that the Act barred monetary recovery. However, the trial court was correct that the Act barred plaintiffs from recovering punitive damages. See 745 ILCS 10/2—102 (West 1994).

Before leaving this portion of the discussion, we address a recent supreme court opinion dealing with municipal immunity under the Act. In *Barnett v. Zion Park District*, 171 Ill. 2d 378 (1996), our supreme court held that section 3—108 of the Act immunized local public entities from liability premised on both negligence and willful and wanton conduct because the legislature's grant of immunity under that section was unambiguous and lacked an exception for willful and wanton misconduct. See *Barnett*, 171 Ill. 2d at 391-92.

*Barnett* involved a swimming pool maintained by the Zion Park District (Zion). Barnett was the special administrator of the estate of her son, 10-year-old Travis King (King). King died after slipping on a diving board, falling backwards, hitting his head on the board, tumbling into the water, and sinking to the bottom of the pool, where he remained for two or three minutes. Although the opinion is not clear on the point, it appears there were six lifeguards on duty at the pool King fell into. See *Barnett*, 171 Ill. 2d at 382. Barnett alleged Zion engaged in willful and wanton conduct because none of the lifeguards initiated lifesaving procedures even though they had been informed King (1) " 'had slipped, [fallen] and struck his head on a diving board and dropped into the water' "; (2) " 'was drowning' "; and (3) " 'was having trouble swimming.' " *Barnett*, 171 Ill. 2d at 391-92.

*Barnett* is distinguishable from the present case for two reasons. First, in *Barnett* the court construed section 3—108 of the Act. See 745 ILCS 10/3—108 (West 1994)(immunizing local public entities and their employees from liability premised on a failure to supervise an activity on public property). The present case involves section 2—104. Justice Freeman, writing for the majority, stated the rationale for the *Barnett* holding as follows:

> "Where the legislature has chosen to limit an immunity to cover only negligence, it has unambiguously done so. [Citations.] [Because] the legislature omitted such a limitation from the plain language of section 3—108, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct." *Barnett*, 171 Ill. 2d at 391-92.

*Barnett* did not, therefore, expressly adopt the proposition that "governmental tort liability and immunity are matters to be determined, ultimately, against what legislation the General Assembly does and does not provide." *Calloway v. Kinkelaar*, 168 Ill. 2d

312, 342 (1995) (Freeman, J., specially concurring). We decline to read *Barnett* as announcing a broad rule that the 1970 Constitution preempts all common-law exceptions to the immunity provided local public entities under the Act. We so decline in light of (1) the recency of *Calloway* in relation to *Barnett*; (2) the fact Justice Freeman's *Calloway* concurrence was not joined by other members of the court; and (3) the lack of sweeping all-inclusive *Calloway*-like language in *Barnett*.

Second, the *Barnett* complaint—unlike the present case—did not contain allegations capable of supporting an inference Zion or its lifeguards acted corruptly, maliciously, or in bad faith. The present case involves allegations that the local public entity itself undertook a course of conduct designed to illegally harm individuals. By contrast, *Barnett* merely involved allegations that employees of a local public entity failed to take action to prevent an individual from being harmed by forces neither the employees nor the local public entity set in motion. In the present case plaintiffs allege that defendant—while processing plaintiffs' zoning petition—decided to acquire plaintiffs' property, directed its employees to stall plaintiffs' petitions, drove plaintiffs into bankruptcy causing La Salle to eventually foreclose, and then purchased the property at below-market value. In *Barnett* the lifeguards passively allowed a harm to occur, without intending the harm to occur; in the present case, defendant allegedly caused the harm to occur and intended plaintiffs to suffer that harm.

## II. TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

■ Plaintiffs next argue the trial court erred in dismissing their seven-count amended complaint. Count I alleged defendant's conduct tortiously interfered with plaintiffs' business expectancy. The elements of this cause of action are (1) existence of a valid business relationship or expectancy; (2) interferer's knowledge of the relationship or expectancy; (3) intentional interference causing breach or termination; and (4) damage to the plaintiff. See, *e.g.*, *Parkway Bank & Trust Co. v. City of Darien*, 43 Ill. App. 3d 400, 402 (1976). The business relationship or expectancy does not require the existence of an enforceable contract. *Parkway Bank & Trust*, 43 Ill. App. 3d at 402.

■ We hold the trial court erred in dismissing count I for failing to show a valid business expectancy. Plaintiffs alleged they "had entered into several business contracts to sell to [both] builders and others various parcels within the [PRD], and had the reasonable expectation of entering into other profitable sale and development contracts." The crux of whether a plaintiff has stated a business or

economic expectancy sufficient to support the cause of action is whether the expectation is reasonable. See *Williams v. Weaver*, 145 Ill. App. 3d 562, 569 (1986). In the present case, plaintiffs allege not only an expectancy but that contracts had already been entered into. Additionally, the following allegations buttress the reasonableness of plaintiffs' expectancy: (1) Spatz convinced La Salle to extend him a loan to purchase River Park; (2) CCE, even following the denial of the first zoning petition, apparently determined the PRD a valid business enterprise; and (3) defendant itself negotiated for, and eventually purchased, the 162-acre parcel for development. The actions taken by all the parties, including defendant, demonstrate a common belief that there was economic advantage to be had by developing the property in question.

The trial court also dismissed the amended complaint because it failed to allege actions on defendant's part directed towards third parties. On appeal, defendant argues that *Du Page Aviation Corp., Flight Services, Inc. v. Du Page Airport Authority*, 229 Ill. App. 3d 793 (1992), requires that the defendant's action be directed toward a third party. *Du Page Aviation*, 229 Ill. App. 3d at 804. Because the amended complaint did not contain such allegations, defendant argues, and the trial court held, plaintiffs failed to plead an element of the cause of action. However, *Du Page Aviation* cites *Parkway Bank & Trust* for this proposition. *Du Page Aviation*, 229 Ill. App. 3d at 804, citing *Parkway Bank & Trust*, 43 Ill. App. 3d at 402-03. The cited passage states that the plaintiff failed to "allege an interference with either a business relation with specific third parties *or* with an identifiable prospective class of third persons." (Emphasis added.) *Parkway Bank & Trust*, 43 Ill. App. 3d at 402-03. We hold, therefore, plaintiff was required to allege either an interference with specific third parties or an identifiable class of third persons. When a plaintiff alleges that its business relationship or expectancy was with a class of third persons, as plaintiffs did in the present case, we believe that the allegation of the interference necessarily implies that the defendant's conduct was directed towards the class as a whole. On this basis, the following allegations from the amended complaint are sufficient to withstand a section 2—615 motion:

> "Defendant wilfully and with a conscious and reckless disregard for the rights of \*\*\* plaintiffs, purposefully and with intent to prevent plaintiffs from obtaining [their] rezoning, developing the property, and consummating [their] contracts of development and conveyance, engaged in the course of conduct hereinbefore set forth, which course of conduct was unreasonable, arbitrary and capricious, \*\*\* and was intended to and did interfere with plaintiffs' business expectancies."

We, therefore, hold that the trial court erred in dismissing count I of the amended complaint.

### III. BREACH OF IMPLIED CONTRACT

Count II alleged defendant breached an implied contract with plaintiffs to consider their zoning petitions in good faith. The amended complaint alleges only that plaintiffs paid the zoning fee and defendant "thereby entered into an implied contract." There are two types of implied contracts, those implied in law (quasi-contract) and those implied in fact. *Zadrozny v. City Colleges*, 220 Ill. App. 3d 290, 295 (1991).

■ A contract implied in fact arises out of evidence demonstrating the parties intended to be bound but failed to reduce their agreement to writing. *Gary-Wheaton Bank v. Burt*, 104 Ill. App. 3d 767, 775 (1982). Plaintiffs failed to allege any facts demonstrating that these parties actually intended to be contractually bound. The trial court, therefore, correctly dismissed count II for failing to state a cause of action on a contract implied in fact.

■ Conversely, a contract implied at law arises regardless of the parties' intentions. *Zadrozny*, 220 Ill. App. 3d at 295. A court must be guided by its sense of equity in deciding whether a quasi-contract should be implied. See *Zadrozny*, 220 Ill. App. 3d at 295. A contract should be implied in law when a defendant receives a benefit and refuses to pay for that benefit, if, under the circumstances, it would be unjust to allow the defendant to retain the benefit. *Marks v. Rueben H. Donnelly, Inc.*, 260 Ill. App. 3d 1042, 1051 (1994). Usually the benefit supplied by the plaintiff takes the form of a service or piece of property rendered unto the defendant. See, *e.g.*, *Klekamp v. City of Burbank*, 266 Ill. App. 3d 81, 86 (1994). However, a quasi-contract may be premised on the payment of a fine by the plaintiff (*Norton v. City of Chicago*, 267 Ill. App. 3d 507, 509 (1994) (stating that plaintiff did not state a cause of action for unjust enrichment because the city did not receive any portion of the penalty paid by the plaintiff, thereby implying the plaintiff could have stated a cause of action had he alleged the city had received a share of the penalty)), or mistaken payment of a fee for city services (*Willens v. City of Northlake*, 19 Ill. App. 2d 316, 317-18 (1958) (payment for water and sewer connection)).

■ We hold that plaintiffs' amended complaint stated a cause of action based on a contract implied at law. Plaintiffs alleged they filed two zoning petitions with defendant. A fair reading of the amended complaint supports an inference that plaintiffs paid various filing and processing fees in connection with the petitions. This inference,

combined with plaintiffs' allegation that defendant acted in bad faith on the basis of corrupt and malicious motives, supports the implication of a contract at law. To hold otherwise would allow a local public entity to accept a fee, in bad faith refuse to provide the service, and then escape liability for the consequences of its bad-faith refusal. Equity will not permit this. When plaintiffs filed their zoning petitions and paid the requisite fees, in effect, they purchased from defendant the right to have the zoning petitions processed in good faith. Plaintiffs allege this did not occur. Therefore, plaintiffs must be permitted to go forward with count II.

We stress that our contract-implied-at-law holding is highly fact-specific and therefore of limited applicability. Founded upon allegations defendant acted in bad faith on the basis of corrupt or malicious motives, we have held that count II is sufficient to withstand a section 2—615 motion to dismiss. Nothing in this opinion should be construed as establishing or supporting the proposition that—absent the kind of extreme and extraordinary allegations of bad faith, corruption, or maliciousness contained in the present case—a contract should be implied at law simply because a local public entity collects payments, taxes, fines, fees, or any other types of compensation.

## IV. VIOLATION OF SECTION 11—12—8

■ Count VII alleged defendant violated section 11—12—8 of the Code. 65 ILCS 5/11—12—8 (West 1994). Section 11—12—8 allows a plaintiff to recover monetary damages for failure to act upon a final plat. 65 ILCS 5/11—12—8 (West 1994) ("If the corporate authorities refuse to act upon the final plat within the time prescribed and if their failure to act thereon is wilful, upon such showing and upon proof of damages the municipality shall be liable therefor"). However, defendant contends—and we agree—that a plaintiff wishing to take advantage of this remedy must first file a complaint for summary judgment. 65 ILCS 5/11—12—8 (West 1994). The monetary remedy is contained in the last sentence of the paragraph pertaining to the summary judgment remedy. See 65 ILCS 5/11—12—8 (West 1994). We read the monetary remedy as an adjunct, not an alternative, to summary judgment. Because plaintiffs never filed a complaint for summary judgment pursuant to section 11—12—8, we hold the trial court correctly concluded count VII was barred by the section's requirements. This determination obviates the need to examine the statute of limitation question.

## V. PROPRIETY OF REZONING

■ Plaintiffs also contend the trial court should have found that plaintiffs had a legally enforceable right to have the property rezoned.

This issue is not ripe for review. The trial court has neither received evidence nor heard argument on the merits. It would, therefore, be inappropriate for us to reach the merits.

## VI. ABUSE OF GOVERNMENTAL POWER

■ Count IV alleged defendant engaged in an abuse of governmental power. On appeal, plaintiffs argue they were deprived of their property without due process in violation of the Illinois Constitution. See Ill. Const. 1970, art. I, § 2. They argue that count IV sufficiently alleges a violation of article I, section 2. Defendant counters that the amended complaint failed to state a takings claim because the zoning regulations did not radically curtail the beneficial or productive use of plaintiffs' property. See *Forest Preserve District v. West Suburban Bank*, 161 Ill. 2d 448, 457 (1994). Defendant misses the point. Count IV does not allege a reduction in the value of the property caused by a zoning ordinance; it alleges that defendant—while processing plaintiffs' zoning petition—decided to acquire plaintiffs' property, directed its employees to stall plaintiffs' petitions, drove plaintiffs into bankruptcy causing La Salle to eventually foreclose, and then purchased the property at below-market value.

Had defendant promulgated an ordinance proclaiming, unilaterally and without compensation, that plaintiffs' property was thereafter owned by defendant, it would have blatantly violated article I, section 2. Defendant, allegedly, attempted to do precisely this, only through subterfuge. It would be absurd to hold that the Illinois Constitution prohibits the government from physically intruding on property or radically curtailing the value of property via regulation without compensating the property owner (*Forest Preserve*, 161 Ill. 2d at 456-57), but does not prohibit the government from corruptly and maliciously conspiring to drive property owners into foreclosure and then purchasing their property. We decline to so hold. The trial court, therefore, erred in dismissing count IV. Finally, however, we hold that count IV does not state a valid cause of action for abuse of process. See, *e.g.*, *McGrew v. Heinold Commodities, Inc.*, 147 Ill. App. 3d 104, 111 (1986); see also 30 Ill. L. & Prac. *Process* § 7 (1993) (the tort of abuse of process is available only for acts occurring in the course of the judicial process).

Nothing in this opinion should be construed as offering a view concerning the proper ultimate disposition of the cause. We hold only that counts I, II, and IV of the amended complaint allege facts which, if proven, could entitle plaintiffs to relief.

For the foregoing reasons, we affirm in part and reverse in part

the judgment of the circuit court of Lake County. The cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

DOYLE and THOMAS, JJ., concur.