THE VILLAGE OF BLOOMINGDALE, Plaintiff and Counterdefendant-Appellee, v. C.D.G. ENTERPRISES, INC., Defendant and Counterplaintiff-Appellant.

Second District   No. 2—99—0400

Opinion filed June 21, 2000.

BOWMAN, J., dissenting.

Michael J. Morrisroe and C. Kent Frederick, both of Michael J. Morrisroe, Ltd., of Bloomingdale, for appellant.

Richard T. Ryan and Mark F. Smolens, both of Flynn, Murphy, Ryan & Seyring, of Chicago, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, the Village of Bloomingdale (Village), sued defendant, C.D.G. Enterprises, Inc., for breach of contract, alleging that defendant had not paid for services the Village provided in reviewing defendant's application for rezoning and site plan approval. Defendant answered and filed a counterclaim alleging tortious interference with business expectancy and for recovery under a quasi-contract theory. The gist of defendant's counterclaim was that the Village corruptly misused its governmental powers to prevent defendant's plans from going forward and appropriated the benefits of defendant's plans for developing the properties at issue for its own ends.

On the Village's motion (see 735 ILCS 5/2—619(a)(9) (West 1998)), the trial court dismissed the counterclaim, holding that both counts were barred by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/1—101 *et seq.* (West 1998)). After the Village voluntarily dismissed its complaint, defendant timely appealed.

On appeal, defendant argues that (1) the Tort Immunity Act does not bar either count of its counterclaim because the Act does not immunize governmental actions undertaken for corrupt or malicious motives; and (2) the Act does not bar the second count of the counterclaim, for quasi-contract, because section 2—101(a) of the Act (745 ILCS 10/2—101(a) (West 1998)) specifically preserves municipal liability based on contract. We reverse and remand.

The Village's complaint alleged the following. By a written agreement, defendant promised to pay the Village for the services of various professionals who advised it concerning defendant's application for rezoning and site plan approval. The Village had repeatedly billed defendant, but defendant had not paid.

Defendant's counterclaim alleged the following facts in support of both counts. Defendant was the contract purchaser of five parcels of land in unincorporated Du Page County. In March 1995, defendant petitioned the Village's plan commission to rezone the five properties so that defendant could build a subdivision between the Glendale Golf Course on the west and Medinah Road on the east. The rezoning would be subject to the Village's annexation of the properties. Before negotiating the contracts to buy the five properties, defendant's representatives met with the Village mayor, who told them the project

would be approved. Beginning in September 1994, defendant's agents met with the Village's land planner and other officials to review defendant's development plan. Following those meetings, defendant submitted its revised land plan, which sought the rezoning and annexation of the properties to permit their development.

The counterclaim alleged further that, between April and October 1995, defendant repeatedly appeared before the planning commission for public hearings on its petition. However, in June or July 1995, the Village secretly formed a "task force" with the aim of insinuating the Village or its chosen developers into the development of the five parcels. Toward this end, the Village pursued the acquisition of the Glendale Golf Course; commissioned Planning Resources, Inc., the Village's consultant in charge of reviewing defendant's petition, to prepare a plan to redesign the golf course so that some of the holes would be on the properties defendant had agreed to acquire; and secretly met with nonresident property owners to create opposition to defendant's plan. The Village kept all these acts secret and never revealed that Planning Resources, Inc., was working in a dual capacity. In August 1995, the planning commission voted down the project, with the chairman pressuring other members to vote no. In October 1995, at a public hearing, the Village's board of trustees voted down defendant's petition. Soon afterward, the Village revealed that it planned to acquire the golf course; it later did so.

Defendant alleged that its petition met all the Village's requirements for rezoning and annexation; that defendant took all the action the Village required; that defendant had spent heavily in reliance on its meetings with the Village; and that, after the Village denied the petition, defendant had to cancel its purchase contracts and forfeit some of what it had paid. Defendant's projected gross profits from the project were $4.8 million.

Count I of the counterclaim alleged that the Village knew of defendant's business expectancy and deliberately frustrated that expectancy by secretly working to force defendant out of the planned development while ostensibly reviewing defendant's petition in order to usurp for itself or for cronies of certain Village officials the benefits of defendant's plans for developing the five parcels. Count II alleged that, when defendant filed its rezoning petition and paid the required fee, the Village became obligated to process defendant's application reasonably and in good faith, which it failed to do. Both counts sought $4.8 million in damages.

In seeking the dismissal of the counterclaim, the Village relied on various provisions of the Tort Immunity Act (see 745 ILCS 10/2—103, 2—104, 2—109, 2—201, 2—205 (West 1998)), arguing that none of the relevant provisions of the Act contained an exception to the immunity

from liability bestowed by the Act. Eventually, the trial court granted the Village's motion and dismissed the counterclaim. Defendant timely appealed.

■ This case comes before us following a dismissal under section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1998)), which provides a means to obtain the summary disposition of issues of law or of easily proved issues of fact. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993). Under section 2—619(a)(9) of the Code, a court may dismiss an action if the claim is barred by affirmative matter avoiding the legal effect of or defeating a claim. 735 ILCS 5/2—619(a)(9) (West 1998). A section 2—619 motion to dismiss admits the legal sufficiency of the cause of action. *Hodge*, 156 Ill. 2d at 115. Our review is *de novo. Hodge*, 156 Ill. 2d at 116.

On appeal, defendant asserts that the Tort Immunity Act bars neither its claim for tortious interference with a business expectancy nor its claim for recovery in quasi-contract. Relying principally on this court's opinion in *River Park, Inc. v. City of Highland Park*, 281 Ill. App. 3d 154 (1996), *appeal after remand*, 295 Ill. App. 3d 90 (1998), *aff'd in part & rev'd in part on other grounds*, 184 Ill. 2d 290 (1998), defendant maintains that the Act's protections do not extend to acts a municipality performs in bad faith or out of corrupt or malicious motives. Defendant also argues that count II of the counterclaim, for quasi-contract, survives any tort immunity challenge because section 2—101(a) of the Act (745 ILCS 10/2—101(a) (West 1998)) states that nothing in the Act affects municipal liability that is based on contract. We agree.

■ The Illinois Constitution of 1970 abolished the doctrine of sovereign immunity, which immunized all governmental units in Illinois from tort liability, except as the legislature may thereafter provide by statute. Ill. Const. 1970, art. XIII, § 4; *Barnett v. Zion Park District*, 171 Ill. 2d 378, 385-86 (1996). Thus, governmental units are liable in tort on the same basis as private tortfeasors (*Barnett*, 171 Ill. 2d at 386), and the Tort Immunity Act defines the situations and circumstances in which governmental units are immune from liability. *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 340 (1998). In construing the Act, we must ascertain and give effect to the intention of the legislature, and we may not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Harinek*, 181 Ill. 2d at 340.

Here, defendant has alleged that the Village displaced defendant from the envisioned development and thereby gathered to itself (or to the cronies of certain Village officials) the profit and benefit the defen-

dant expected to earn. The gravamen of defendant's complaint, therefore, is the Village's theft of defendant's opportunity. Thus, defendant is not complaining of the denial of its petition *per se* but, rather, of the Village's abuse of the governmental process and power to hijack defendant's plans. An examination of the relevant provisions of the Act (sections 2—103, 2—104, 2—109, 2—201, and 2—205) does not indicate any willingness on the part of the legislature to immunize a local governmental unit from the consequences of misusing its powers to oppress its constituents and appropriate to itself or its cronies the expected benefits of the constituents' business ventures.

▪ In addition, we note that, from the earliest cases interpreting the Act, Illinois courts have uniformly held that malicious and corrupt actions are not covered by the Act. See, *e.g.*, *Young v. Hansen*, 118 Ill. App. 2d 1, 9 (1969) (immunity of Act does not extend to misuse of official power); *Idlehour Development Co. v. City of St. Charles*, 88 Ill. App. 3d 47, 52 (1980) (same); *Madonna v. Giacobbe*, 190 Ill. App. 3d 859, 869 (1989) (acts performed with corrupt or malicious motives not immunized by Act); *River Park*, 281 Ill. App. 3d at 163 (Act does not apply to corrupt, malicious, or bad-faith conduct). The unifying principle observed throughout these cases is the misuse of governmental authority for corrupt and oppressive purposes.

In *River Park*, the plaintiff alleged that, after obtaining initial approval for its plans to residentially develop a golf course community, the city embarked upon a course of stonewalling, with the result that the plaintiff's permit to develop the property lapsed. *River Park*, 281 Ill. App. 3d at 159. This in turn forced the plaintiff into bankruptcy and caused the plaintiff to begin the zoning process with the city anew. *River Park*, 281 Ill. App. 3d at 160-61. During the second attempt to zone the property, the city demanded proof that the plaintiff owned the parcel even though it had no authority to make the request. The city refused to consider any of the plaintiff's evidence as to ownership and "deemed" the plaintiff's petition to be withdrawn. *River Park*, 281 Ill. App. 3d at 161. Thereafter, the city purchased the parcel at a price well below the market value and developed the property itself according to the plaintiff's plans. *River Park*, 281 Ill. App. 3d at 161. This court held that the Act would not shield the city from liability for its corrupt actions of forcing the plaintiff into bankruptcy and then appropriating the property for itself thereby usurping from the plaintiff the benefit of developing the property. *River Park*, 281 Ill. App. 3d at 163-64.

*River Park* bears a striking resemblance to the case at bar. Here, as well, defendant complains that the Village acted to force defendant out of the picture and then gained control over the property defendant

sought to develop and developed it as defendant had planned. We have examined both the Act and the cases interpreting the Act and conclude that the legislature did not intend to immunize the corrupt misuse of governmental power. Accordingly, we hold that the trial court erroneously dismissed count I of defendant's counterclaim.

■ The Village's arguments that the Act offers it immunity in this case are based on a fundamental misapprehension of defendant's counterclaim. The Village focuses its argument solely on the denial of the petition. While this denial is one of many acts comprising the conduct of the Village, it is not the gravamen of defendant's action. Rather, the corrupt misuse of the Village's power to steal away the expected benefits of defendant's plans to develop the property constitutes the basis of defendant's action. Thus, defendant's counterclaim does not run afoul of the recent decisions interpreting the Act (see, e.g., *Henrich v. Libertyville High School*, 186 Ill. 2d 381 (1998); *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335 (1998); *Barnett v. Zion Park District*, 171 Ill. 2d 378 (1996)), because defendant is not complaining that the simple denial of its petition led to its injury; rather, the abuse of official process and power caused its injury. Accordingly, the Village's analysis is inapposite to the case at hand.

Turning to count II of defendant's counterclaim, section 2—101 of the Act (745 ILCS 10/2—101(a) (West 1998)) states that the Act does not affect "liability *** based on *** Contract." Defendant notes that section 2—101(a) preserves municipal liability in quasi-contract. *Woodfield Lanes, Inc. v. Village of Schaumburg*, 168 Ill. App. 3d 763, 768-69 (1988). Defendant argues that it established an action in quasi-contract, alleging that, in return for defendant's permit application fee, the Village was obligated to process the application in good faith and according to its usual procedures and that the Village is liable in quasi-contract for its failure to act in good faith. We agree.

Initially, we note that, in *River Park*, we found that the plaintiff had established the elements of an implied contract and allowed the action to go forward. *River Park*, 281 Ill. App. 3d at 168. Similarly, in this case, defendant alleged that the fees paid for the processing of its petition obligated the Village to proceed in good faith on the petition and that defendant alleged that, instead, the Village acted to force defendant out of the development of the property. We hold, therefore, that the trial court erroneously dismissed count II of defendant's counterclaim.

The Village argues that count II is merely defendant's tort claim restyled to fit the formal requirements of pleading a quasi-contractual action. Even so, our holding above, that the Act does not immunize the acts alleged in count I, sounds the death knell for this argument

as well. Even allowing the Village's contentions about count II, the same reasoning as above applies and defeats the Village's argument here.

Accordingly, we reverse the judgment of the circuit court of Du Page County and remand the cause for further proceedings consistent with this order.

Reversed and remanded.

COLWELL, J., concurs.

JUSTICE BOWMAN, dissenting:

I dissent. I agree with the trial court and the Village that the counterclaim is barred by section 2—104 of the Tort Immunity Act (Act) and in part by section 2—106 of the Act. Under both accepted rules of statutory construction and article XIII, section 4, of our constitution (Ill. Const. 1970, art. XIII, § 4), we may not alter these provisions by creating an exception for "bad faith" or "corruption" where the legislature has clearly declined to do so. Therefore, I would hold that our opinion in *River Park* is not good law because it disregards these fundamental rules.

I turn first to count I of the counterclaim. The majority gives two reasons why section 2—104 does not bar count I. The first is that the denial of the petition is not the "gravamen" of count I but merely "one of many acts comprising the conduct of the Village." 314 Ill. App. 3d at 215. The majority does not elaborate or refer to the text of section 2—104, but I gather it is saying that the counterclaim is not within the literal language of section 2—104. I disagree. As pertinent here, section 2—104 provides:

> "A local public entity is not liable for *an injury caused by the* issuance, *denial*, suspension or revocation of, or by the *** *refusal to issue* *** any permit ***."* (Emphasis added.) 745 ILCS 10/2—104 (West 1998).

This language says only that a municipality is not liable for an injury that is "caused by" the denial of or refusal to issue a permit. It does *not* say that the denial of the permit must be the "sole cause" of the injury or the "gravamen" of the tort claim. Thus, even were I to accept the majority's characterization of the counterclaim, I would still conclude that section 2—104 applies. In ordinary parlance, defendant's injury was "caused by" the Village's allegedly tortious denial of its permit application. Had the Village granted the permit, defendant would not have suffered its alleged injury and there would be no counterclaim. Even the majority concedes that a major element of the

Village's alleged misconduct was "ostensibly reviewing defendant's petition" while intending all along to deny it. 314 Ill. App. 3d at 212. Thus, even if the counterclaim really alleges numerous misdeeds that are wholly separate from the tortious denial of the permit, the denial of the permit is a "but-for" cause and a "proximate" cause of the alleged injury. That alone puts the counterclaim within section 2—104.

Moreover, I believe the majority seriously misreads the counterclaim when it states that the denial of the permit is not the cause of defendant's injury and that "the corrupt misuse of the Village's power to steal away the expected benefits of defendant's plans *** constitutes the basis of defendant's action." 314 Ill. App. 3d at 215. The majority's distinction is illusory. The counterclaim leaves no doubt that the various misuses of power have significance only as they relate to the denial of defendant's permit application. These acts supplied either the motives for the Village to sabotage the petition or the mechanisms by which the Village engineered the allegedly tortious denial of the petition. A fair reading of the counterclaim shows that the Village's "corrupt misuse of power" did not consist of acts disconnected from the permit process. Rather, the alleged misdeeds were all geared to the ultimate goal of ensuring that defendant's permit would be denied.

This conclusion is borne out not only by the whole structure of the counterclaim but also by much specific language that the majority appears to have overlooked. Thus, referring to the mayor's promise that the petition would be approved, the formation of the secret task force, and the attempts to manufacture opposition to the petition, paragraph 13 of the counterclaim states that "[t]he clear intention of these acts were [sic] to *subvert and manipulate the public hearing process so as to deprive Counterplaintiff of a fair and impartial hearing* so that the Village *** could acquire the parcels." (Emphasis added.) Having summarized all of the Village's alleged misdeeds, the counterclaim alleges in paragraph 33 that the Village intentionally undertook "the wrongful course of conduct aforesaid, *designed to subvert the public hearing process so as to predetermine the outcome, causing Counterplaintiff to ultimately be forced to cancel the land purchase contracts.*" (Emphasis added.) Defendant itself plainly states that the bad-faith denial of its petition was not merely one of many wrongful acts but the basic cause of its injury. The Village's other misdeeds had meaning only as they brought about the wrongful denial of the permit. That was the point of the whole scheme. It is no wonder the counterclaim alleges at length that defendant met all the prerequisites for a permit and that, but for the Village's tortious acts, the petition would not have been denied. It is also no wonder that even defendant has never adopted the majority's claim that its injury was not caused by the denial of its petition.

Having rejected the majority's first reason for reversing the trial court, I turn to its second reason: that section 2—104 does not protect conduct undertaken in bad faith or for malicious motives. The majority notes that *River Park* and several other appellate court cases have so held. However, the Village does not contest the existence of these opinions—only their validity. The majority sidesteps the Village's cogent arguments against these opinions. I now explain why I agree with the Village.

First, I think the plain language of section 2—104 requires such a result. Where the language of a statute is unambiguous, the only legitimate function of the courts is to enforce the law as the legislature wrote it. *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 391 (1998); *Stokes v. Colonial Penn Insurance Co.*, 313 Ill. App. 3d 202, 204 (2000). Our supreme court has applied this imperative to the Act by repeatedly admonishing us not to "depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 193 (1997); see also *Henrich*, 186 Ill. 2d at 394-95; *Barnett v. Zion Park District*, 171 Ill. 2d 378, 389 (1996).

I believe that the plain meaning rule by itself refutes *River Park* and disposes of count I of the counterclaim. Section 2—104's language is unqualified. It makes no exceptions for bad faith, corruption, or malice. Where the legislature wished to create such exceptions, it knew how to do so. Thus, the Act protects a municipal employee from liability for acting under the apparent authority of an unconstitutional, invalid, or inapplicable law, but it explicitly conditions that immunity on good faith and the absence of malice. 745 ILCS 10/2—203 (West 1998). The Act makes a comparable *explicit* limitation on immunity from liability for instituting judicial or administrative proceedings. See 745 ILCS 10/2—208 (West 1998). Such a limitation is conspicuously absent from section 2—104. Thus, an opinion that *River Park* overlooks states that section 2—104 grants absolute immunity. *Foster & Kleiser v. City of Chicago*, 146 Ill. App. 3d 928, 932 (1986).

Notably, any exception for bad faith or malice is absent from section 2—206 (745 ILCS 10/2—206 (West 1998)), which gives municipal employees the same immunities section 2—104 gives municipalities. It is settled that section 2—206 provides employees with absolute, not qualified, immunity. *Glenn v. City of Chicago*, 256 Ill. App. 3d 825, 842 (1993); *Foster & Kleiser*, 146 Ill. App. 3d at 932. By reading the parallel language of section 2—104 differently, the majority violates not only the plain meaning rule but also the rule that provisions *in pari materia* should be construed consistently. See *Helle v. Brush*, 53 Ill. 2d 405, 408 (1973).

In disregarding the plain meaning of section 2—104, the majority appears to assume that the legislature simply could not have intended to protect the sort of corruption alleged here. Yet the legislature's decision to grant absolute immunity from private tort suits and leave the redress of corruption to voters and criminal sanctions is neither unreasonable nor unusual. Many jurisdictions provide comparable blanket immunity by statute or court decision. See, *e.g.*, *Barr v. Matteo*, 360 U.S. 564, 3 L. Ed. 2d 1434, 79 S. Ct. 1335 (1959); *Richards v. Ellis*, 233 A.2d 37 (Me. 1967); *Ford v. Kenosha County*, 160 Wis. 2d 485, 466 N.W.2d 646 (1991). This is not because they condone corruption but because they recognize that, without blanket immunity, all officials, corrupt or honest, could at any time be sued for doing their jobs. These jurisdictions endorse Learned Hand's oft-cited statement that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).

Indeed, our own courts have recognized that many sections of the Act itself make similar choices. See *Payne v. Lake Forest Community High School District 115*, 268 Ill. App. 3d 783, 786-87 (1994) (observing that numerous sections of the Act unambiguously grant absolute immunity); *Glenn*, 256 Ill. App. 3d at 842-43 (sections 2—205 and 2—206 grant absolute immunity); *Carter v. City of Elmwood*, 162 Ill. App. 3d 235, 236-37 (1987) (section 2—205 provides absolute immunity). That is clearly the choice our legislature made with section 2—104. We may not rewrite section 2—104 because we might have chosen differently.

The majority's refusal to apply section 2—104 as it is written violates not only principles of statutory construction but also our constitution. In *Harinek*, the supreme court overruled opinions that limited section 2—201's broad language (see 745 ILCS 10/2—201 (West 1996)) by reading in the "special duty rule," a common-law exception to the common-law "public duty" rule of immunity. The court relied on article XIII, section 4, of the 1970 Constitution (Ill. Const. 1970, art. XIII, § 4), which states, "Except as the General Assembly may provide by law, sovereign immunity in this State is abolished." *Harinek* held that this language gives the legislature plenary authority over the scope of municipal tort immunity, erasing common-law rules of sovereign immunity *and* forbidding courts from writing them back into the law. Thus, where the Act immunizes a municipality, a court "may not then negate that statutory immunity by applying a common law exception to a common law rule. Doing so would violate not only [article XIII, section 4,] but also the Constitution's separation of powers clause ***." *Harinek*, 181 Ill. 2d at 346.

*Harinek* endorsed Justice Freeman's earlier critique of many appellate court opinions issued after 1970 that read the special duty doctrine into the Act. As Justice Freeman noted, these opinions assumed that certain opinions issued before 1970 were still good law. This assumption was mistaken because the adoption of article XIII, section 4, in 1970 wholly displaced common-law doctrines of municipal tort immunity. *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 339-40 (1995) (Freeman, J., specially concurring).

Like the special duty rule, the bad-faith-malice doctrine is a common-law exception to a common-law rule of governmental immunity for certain official acts. See *People ex rel. Schreiner v. Courtney*, 380 Ill. 171, 179 (1942); *Young v. Hansen*, 118 Ill. App. 2d 1, 8-9 (1969). Just like the courts that wrongly perpetuated the special duty doctrine, the *River Park* court (admittedly lacking the clear instructions of *Harinek*) assumed that the Act incorporates such common-law rules of sovereign immunity rather than recognizing that, as a result of article XIII, section 4, of the 1970 Constitution, the Act wholly displaces these rules. *River Park* fails to address the crucial effect of article XIII, section 4, and it relies entirely on opinions that are equally silent on this dispositive consideration. *Madonna* simply follows *Idlehour*, which uncritically adopts *Young*'s *dicta* reading a bad-faith-malice exception into section 2—104. *River Park* cites other opinions adopting the bad-faith-malice doctrine (*River Park*, 281 Ill. App. 3d at 163), but they also depend on *Young*'s premise that we may read common-law rules into the Act. Thus, if *Young* is unsound, the whole house of cards topped by *River Park* falls.

I think it is clear after *Harinek*, if it was not before, that *Young* is simply dead wrong in suggesting we may read the bad-faith-malice doctrine into section 2—104 and thereby alter its plain meaning. *Young* provides no support for ignoring the effect of article XIII, section 4. This is understandable, as *Young* was decided a year before article XIII, section 4, was adopted. However, this only highlights the illogic of relying on *Young* after 1970. In adopting *Young*'s *dicta*, the *River Park* court committed exactly the fallacy of the opinions that upheld the special duty doctrine after 1970. The majority here perpetuates that fallacy. It can rescue *River Park* only by defying *Harinek*'s clear command not to read anachronistic common-law doctrines into the Act.

In addition to relying on section 2—104, the Village argues that other parts of the Act bar count I of the counterclaim. The majority responds baldly that these sections do not apply to the corrupt scheme alleged here. Besides reiterating what I have already written, I note that section 2—106 of the Act excludes liability for "an injury caused

by an oral promise or misrepresentation of its employee, *whether or not such promise or misrepresentation is negligent or intentional."* (Emphasis added.) 745 ILCS 10/2—106 (West 1998). This plain language protects outright *lies*, which are always told in bad faith and often stem from malice or corrupt motives. The majority errs in reading a bad-faith-malice exception into section 2—106 *and* in reading out language negating such an exception. Insofar as count I rests on oral misrepresentations, *e.g.*, the mayor's assurance that the permit would be approved, it is barred by section 2—106.

I would also affirm the dismissal of count II of the counterclaim. Defendant argues that count II may stand because the Act does not bar "liability *** based on *** Contract." 745 ILCS 10/2—101(a) (West 1998). However, I agree with the Village that, although count II is nominally for "quasi-contract," it is in substance a rerun of count I's tort claim. The two counts rely on essentially the same facts, and the "quasi-contract" of count II is simply the Village's implied promise not to decide defendant's permit application in bad faith, *i.e.*, not to commit tortious interference with defendant's business expectancy. Also, count II does not seek restitution, the correct remedy for a claim in quasi-contract (see *Barry Mogul & Associates, Inc. v. Terrestris Development Co.*, 267 Ill. App. 3d 742, 750 (1994)), but the same tort damages count I seeks.

Moreover, it is important to distinguish between liability based on contract and the cause of action that, for historical reasons, has come to be labeled "quasi-contract." In the latter case, there is no contract between the parties, and the plaintiff (or counterplaintiff) asks the court to remedy a wrong by imposing a contract. See *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 497 (1992); *Barry Mogul & Associates*, 267 Ill. App. 3d at 750. Thus, a contract implied in law is "no contract at all," but a rule of law requiring the restitution of a benefit. D. Dobbs, Handbook on the Law of Remedies § 4.2, at 235 (1973). The actual liability is not based on a contract; the contract is only the remedy. Therefore, I do not believe that the mere use of the label "quasi-contract" establishes that a claim is one for liability "based on Contract" under the Act.

While I do not dispute that a cause of action for quasi-contract *may* be within section 2—101(a), logic would dictate that this is so only where the nature of the claim is contractual and the suit is not in essence an attempt to obtain compensation for alleged torts. See, *e.g.*, *Woodfield Lanes, Inc. v. Village of Schaumburg*, 168 Ill. App. 3d 763, 768-69 (1988) (plaintiff who built sewer could recover cost from village that later acquired sewer). To hold otherwise would enable parties to use section 2—101(a) of the Act to do an end run around the im-

munity provisions found elsewhere throughout the Act, an absurd result I would not ascribe to the legislature. Finally, I note that the majority supplies no reasoning to suggest that count II may stand if count I is barred.

I believe that the Tort Immunity Act means what it says and that the trial court did not err in dismissing the counterclaim. Therefore, I respectfully dissent.