(No. 89963.—

# THE VILLAGE OF BLOOMINGDALE, Appellant, v. CDG ENTERPRISES, INC., Appellee.

*Opinion filed June 21, 2001.*

McMORROW, J., concurring in part and dissenting in part.

Richard T. Ryan and Mark F. Smolens, of Ryan, Smolens & Jones, of Chicago, for appellant.

Michael J. Morrisroe and Teresa L. Einarson, of Bloomingdale, for appellee.

JUSTICE THOMAS delivered the opinion of the court:

This case arises from the Village of Bloomingdale's denial of a zoning petition submitted by CDG Enterprises, Inc., and presents two issues for our review. First, whether the Illinois Constitution permits imposition of the common law "corrupt or malicious motives" excep-

tion to certain immunities afforded by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/1—101 *et seq.* (West 1998)). Second, whether a claim for quasi-contract is proper under section 2—101(a) of the Act (745 ILCS 10/2—101(a) (West 1998)) and whether the counterplaintiff alleged sufficient facts for this court to impose a quasi-contract remedy. For the reasons set forth below, we hold that the Illinois Constitution prohibits the insertion of the common law "corrupt or malicious motives" exception into the immunities provided by the Act. In addition, we hold that, though section 2—101(a) of the Act, which preserves municipal liability for contract, does not contemplate the remedy of quasi-contract, the counterplaintiff has failed to sufficiently assert a claim for that remedy. Accordingly, we reverse the appellate court.

## BACKGROUND

Plaintiff, the Village of Bloomingdale (Village), sued CDG Enterprises, Inc. (CDG), in the circuit court of Du Page County, for breach of contract alleging that CDG had not paid for services the Village had provided in reviewing its petition for rezoning and site plan approval. CDG, as counterplaintiff, answered and filed two counterclaims, one for tortious interference with business expectancy and another for recovery under a quasi-contract theory. These counterclaims are at issue in this appeal.

In support of both counts, CDG alleged the following facts, which we will take as true for purposes of this appeal on the Village's motion to dismiss. See *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 161 (1997). CDG was the contract purchaser of five parcels of land adjacent to the Village of Bloomingdale. In March 1995, CDG petitioned the Village's planning commission to annex the five parcels into the Village and rezone them so that CDG could build a subdivision. CDG's representatives met with the Village's land plan-

ner and other officials, including the Village mayor, who allegedly told CDG that the project would be approved. Between April and October 1995, CDG repeatedly appeared before the Village planning commission for public hearings on its petition.

CDG further stated that, in June or July 1995, the Village allegedly: secretly formed a "task force" in order to pursue the acquisition and development of a golf course, which was adjacent to the five parcels; commissioned Planning Resources, Inc., the Village's consultant in charge of reviewing CDG's petition, to prepare a plan to redesign the golf course so that some of the holes would be on the property CDG intended to acquire; and secretly met with other individuals to create opposition to CDG's plan. In August 1995, the Village planning commission voted down CDG's project, with the chairman allegedly pressuring other members to vote against it. Then, in October 1995, the Village's board of trustees voted down CDG's petition at a public hearing. Soon afterward, the Village publicly revealed that it planned to acquire the golf course, and later did so. In addition, one of the parcels was allegedly bought by individuals "closely aligned with certain of the Village's officials." CDG has not claimed that the Village itself acquired any of the five parcels which CDG had intended to purchase.

CDG further alleged that its petition met all the Village's requirements for rezoning and annexation; that CDG took all the action the Village required; that CDG had spent heavily in reliance on its meetings with the Village; and that, after the Village denied the petition, CDG had to cancel its purchase contracts and forfeit some of what it had paid. CDG's projected gross profits from the project were $4.8 million.

Count I of the counterclaim alleged that the Village deliberately frustrated CDG's business expectancy by secretly working to force CDG out of the planned develop-

ment. While ostensibly reviewing CDG's petition, the Village allegedly planned all along to develop the adjoining golf course and help cronies of certain Village officials purchase one of the five parcels. Count II alleged that, when CDG filed its rezoning petition and paid the required fee, the Village became obligated through quasi-contract to process CDG's petition reasonably and in good faith, which it failed to do. CDG never stated what the Village or any of its employees gained by their alleged misconduct. Both counts sought in damages the projected gross profits of $4.8 million.

The Village moved to dismiss the counterclaims pursuant to section 2—619(a)(9) of the Code of Civil Procedure (the Code) (735 ILCS 5/2—619(a)(9) (West 1998)). It asserted sovereign immunity based on various provisions of the Tort Immunity Act (see 745 ILCS 10/2—103, 2—104, 2—106, 2—109, 2—201, 2—205 (West 1998)). The trial court dismissed the counterclaims, holding that both were barred by the Village's sovereign immunity under the Act. The Village then voluntarily dismissed its complaint, and CDG appealed.

Before the appellate court, CDG argued that (1) the Tort Immunity Act did not bar its counterclaims because the Act does not immunize governmental actions undertaken for "corrupt or malicious motives"; and (2) the Act did not bar the second count for quasi-contract because section 2—101(a) of the Act (745 ILCS 10/2—101(a) (West 1998)) specifically preserves municipal liability based on contract.

The appellate court reversed the trial court and held that CDG's tort claim could proceed under the Act. The court rejected the Village's affirmative defenses and held that the general grants of immunity afforded by the Act are limited by the common law exception for "corrupt or malicious motives." 314 Ill. App. 3d 210, 214-15. The appellate court also reversed the trial court as to the second

count and held that the Village could be held liable in quasi-contract to process CDG's petition in good faith and according to its usual procedures, and that that claim fell under section 2—101(a) and was, therefore, not barred by the Act. 314 Ill. App. 3d at 215.

The Village appealed and we granted review of both issues under Rule 315(a) (177 Ill. 2d R. 315(a)). Since the trial court dismissed CDG's counterclaim under section 2—619(a)(9) of the Code (735 ILCS 5/2—619(a)(9) (West 1998)), our review is *de novo. Henrich v. Libertyville High School*, 186 Ill. 2d 381, 386 (1998).

## ANALYSIS

### I. The Tort Immunity Act

Traditionally, a governmental unit in Illinois was immune from tort liability pursuant to the common law doctrine of sovereign immunity. In 1959, however, this court abolished the doctrine in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 25 (1959). Then, in response to *Molitor*, the legislature in 1965 enacted the Tort Immunity Act (745 ILCS 10/1—101 *et seq.* (West 1998)). Under the Act, Illinois adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions. *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 506 (1990). Finally, in 1970, the state adopted a new constitution and with it a new provision regarding sovereign immunity. Article XIII, section 4, of the 1970 Constitution states: "Except as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. 1970, art. XIII, § 4. Today, therefore, the tort liability of a local public entity or employee is expressly controlled both by the constitutional provision and by legislative prerogative as embodied in the Tort Immunity Act. *Burdinie*, 139 Ill. 2d at 507.

The purpose of the Tort Immunity Act is to protect local public entities and public employees from liability arising from the operation of government. 745 ILCS 10/1—101.1(a) (West 1998). "By providing immunity, the legislature sought to prevent the diversion of public funds from their intended purpose to the payment of damage claims." *Bubb v. Springfield School District 186*, 167 Ill. 2d 372, 378 (1995). The Tort Immunity Act grants only immunities and defenses; it does not create duties. 745 ILCS 10/1—101.1(a) (West 1998). "Rather, the Act merely codifies those duties existing at common law, to which the subsequently delineated immunities apply." *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386-88 (1996) (finding that park district owed plaintiff a common law duty of reasonable care); *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 192 (1997) ("governmental units are liable in tort on the same basis as private tortfeasors unless a tort immunity statute imposes conditions upon that liability"); *Bubb*, 167 Ill. 2d at 378; *West v. Kirkham*, 147 Ill. 2d 1, 14 (1992); *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 412 (1991). The existence of a duty and the existence of an immunity, therefore, are separate issues. *Barnett*, 171 Ill. 2d at 388. Once a court determines that a duty exists, it then addresses whether the governmental unit or employee is immune from liability for a breach of that duty. See *Barnett*, 171 Ill. 2d at 388. In other words, because the Act implicitly recognizes duties which already exist at common law, we may refer to the common law to determine the duties a local public entity holds. But to determine whether that entity is liable for the breach of a duty, we look to the Tort Immunity Act, not the common law.

## II. CDG's Counterclaim in Tort

This court has already established a significant line of precedent regarding the existence of common law exceptions to immunities granted by the Act. The first

case relevant to our discussion is *Barnett v. Zion Park District*, 171 Ill. 2d 378 (1996), where we considered whether the Act afforded immunity to a park district from a claim arising from the drowning of a 10-year-old boy in the district's pool. The district claimed immunity under section 3—108(a), which provides in relevant part that, "neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3—108(a) (West 1992). The plaintiff alleged that the boy drowned in the vicinity of six lifeguards despite requests for help by bystanders and, therefore, the park district was liable for "willful and wanton misconduct." *Barnett*, 171 Ill. 2d at 391.

In dismissing the plaintiff's claim in *Barnett*, we held that though the district owed the child a common law duty of reasonable care, it was immune under section 3—108 from liability for breaching that duty. *Barnett*, 171 Ill. 2d at 388, 391-92. We observed that when the legislature intended to limit an immunity to cover only negligence and not willful and wanton misconduct, it had "unambiguously done so." *Barnett*, 171 Ill. 2d at 391, citing, *e.g.*, 745 ILCS 10/2—202, 2—210, 3—106, 3—109(c)(2), 4—105, 5—103(b), 5—106 (West 1992). Unlike those instances, however, the plain language of section 3—108 contained no exception for willful and wanton misconduct. We reasoned that "[s]ince the legislature omitted such a limitation from the plain language of section 3—108, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct." *Barnett*, 171 Ill. 2d at 391-92. We concluded, therefore, that "given the full immunity provided by the legislature in the unconditional language of section 3—108" of the Act, the park district was immune from liability. *Barnett*, 171 Ill. 2d at 393. See also *West v. Kirkham*, 147 Ill. 2d 1, 6-7 (1992) (declin-

ing to insert notice requirement as a "substantial limitation on the immunity of section 3—104 where none exists").

Likewise, in *In re Chicago Flood Litigation*, 176 Ill. 2d 179 (1997), we held that the City of Chicago was immune under section 2—201 of the Act for its alleged failure to supervise the construction work of a contractor on city bridges and for its failure to warn local residents of the resulting water damage and to repair the damage. *Chicago Flood*, 176 Ill. 2d at 192, 195-97; see 745 ILCS 10/2—201 (West 1998). Section 2—201, which is at issue in this case, provides that, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2—201 (West 1998). In *Chicago Flood*, we based our holding on the same rationale as set forth in *Barnett* and reasoned that since the plain language of section 2—201 did not contain the common law exception to immunity for "willful and wanton misconduct," the employee, and consequently the City, were immune from liability. *Chicago Flood*, 176 Ill. 2d at 196.

Next, in *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335 (1998), we addressed sections 2—109 and 2—201 of the Act with regard to the liability of the City of Chicago and its employee, a fire marshal. See 745 ILCS 10/2—109 (West 1998) (providing that a local public entity is not liable "for an injury resulting from an act or omission of its employee where the employee is not liable"). The plaintiff in *Harinek* alleged that the City of Chicago fire marshal negligently conducted a fire drill and that the fire marshal's conduct was "willful and wanton." *Harinek*, 181 Ill. 2d at 338. We held that the fire marshal's conduct constituted acts

or omissions in determining policy and exercising discretion under section 2—201. *Harinek*, 181 Ill. 2d at 342-43. We further held that section 2—201 did not contain an exception for "willful and wanton misconduct" and, pursuant to *Chicago Flood*, therefore, such a claim was barred by the City's immunity under the Act. *Harinek*, 181 Ill. 2d at 347, citing *Chicago Flood*, 176 Ill. 2d at 196.

Finally, in *Henrich v. Libertyville High School*, 186 Ill. 2d 381 (1998), we again followed the plain language of the Act and declined to recognize the common law exception for "willful and wanton misconduct" in the immunity afforded to local public entities and employees under section 3—108. *Henrich*, 186 Ill. 2d at 395; see 745 ILCS 10/3—108 (West 1998).

We turn now to the instant case, where CDG asks that we impose the common law exception for "corrupt or malicious motives" onto certain provisions of the Act. Based on the foregoing precedent, we think it obvious that, just as the Act does not contemplate an exception to immunity for "willful and wanton misconduct," unless it expressly provides for such, the Act does not implicitly contemplate the common law exception for "corrupt or malicious motives." None of the provisions on which the Village relies expressly recognize an exception for conduct inspired by "corrupt or malicious motives." See 745 ILCS 10/2—103, 2—104, 2—106, 2—109, 2—201, 2—205 (West 1998). It is well settled that "[w]here an enactment is clear and unambiguous a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express." *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). See also *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 508 (2000); *Henrich*, 186 Ill. 2d at 394-95; *Chicago Flood*, 176 Ill. 2d at 193; *Barnett*, 171

Ill. 2d at 388-89. Therefore, because the plain language of these provisions does not contain an exception for "corrupt or malicious motives," we will not insert one.

Moreover, if this court were to recognize an exception for "corrupt or malicious motives" where none exists at all in the Act, we would be venturing into the province of the legislature and violating the separation of powers. As we explained in *Harinek*,

> "[W]hen a court finds *** that the General Assembly has granted a public entity immunity from liability, the court may not then negate that statutory immunity by applying a common law exception to a common law rule. Doing so would violate not only the Illinois Constitution's provision governing sovereign immunity (Ill. Const. 1970, art. XIII, § 4), but also the Constitution's separation of powers clause, which provides that no branch of government 'shall exercise powers properly belonging to another.' Ill. Const. 1970, art. II, § 1." *Harinek*, 181 Ill. 2d at 346-47.

See also *Michigan Avenue*, 191 Ill. 2d at 522, quoting *People v. Garner*, 147 Ill. 2d 467, 475-76 (1992) (" 'Under the doctrine of separation of powers, courts may not legislate, rewrite or extend legislation. If the statute as enacted seems to operate in certain cases unjustly or inappropriately, the appeal must be to the General Assembly, and not to the court' "). If the legislature had intended to include an exception for "corrupt or malicious motives," it would have done so. Indeed, it has recognized exceptions elsewhere. In section 2—202, for example, the legislature granted immunity to a public employee for an "act or omission in the execution or enforcement of any law *unless* such act or omission constitutes *willful and wanton conduct*." (Emphases added.) 745 ILCS 10/2—202 (West 1998). In section 3—106, the legislature again recognized an exception to liability for willful and wanton misconduct. 745 ILCS 10/3—106 (West 1998). The legislature has recognized exceptions to its grants of immunity and enumerated these exceptions in the plain language of the Act. See, *e.g.*, 745 ILCS 10/

2—202, 2—203, 2—208, 3—106, 3—109(c)(2), 4—105, 5—103(b), 5—106 (West 1998). On the other hand, *no* provision of the Act contains an exception for "corrupt or malicious motives." We will not adopt the legislative prerogative to insert such an exception and, therefore, decline to impose the common law "corrupt or malicious motives" exception onto the immunities claimed by the Village in the instant case.

The appellate court in this case held that the conduct complained of by CDG did not even fall within any of the specific government functions immunized by the Act. It reasoned that CDG was "not complaining of the denial of its petition *per se* but, rather, of the Village's abuse of the governmental process and power to hijack [CDG's] plans." 314 Ill. App. 3d at 214. CDG's claim was really about the "corrupt misuse of the Village's power to steal away the expected benefits of [CDG's] plans to develop the property." 314 Ill. App. 3d at 215. The "gravamen" of CDG's claim, in other words, was the "Village's theft of [CDG's] opportunity." 314 Ill. App. 3d at 213-14.

The appellate court's characterization of CDG's claim is mistaken because it ignores the plain language of the Act. Under section 2—104 of the Act, for example, local public entities are immune from liability for "injury caused by the *** denial ***, or by the failure or refusal to issue *** any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued [or] denied." 745 ILCS 10/2—104 (West 1998). The Village's denial of CDG's rezoning petition is precisely what the legislature intended to immunize such entities from. CDG attempts to avoid this result by claiming that it really challenges the *process* by which the Village denied its petition, not the mere fact that it was denied. But whether the Village denied the petition through an "abuse of official process

and power," through "corrupt and malicious misuse of power," or for "corrupt or malicious motives," as CDG claims, is wholly immaterial to CDG's claim in tort. It is immaterial because section 2—104 contains no reference to intent whatsoever and, again, it certainly does not contain an exception for "willful and wanton misconduct" or "corrupt or malicious motives."

As another twist on the above argument, CDG attempts to frame its attack on the process by which the Village denied its petition by labeling the denial a "ministerial task." CDG alleges that the Village's course of conduct was a "deviation from the standard of usual and customary zoning procedures," and that the Village is not immune for its improper performance of this ministerial task.

CDG correctly asserts that though a municipality is immune from liability in its performance of discretionary tasks, it cannot claim immunity for the improper performance of ministerial tasks. *Chicago Flood*, 176 Ill. 2d at 193-94. In fact, the discretionary immunity doctrine is codified in sections 2—109 and 2—201 of the Act, which provide that "a public employee serving in a position involving the determination of policy or the exercise of discretion [and, thereby, the local public entity,] is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2—109, 2—201 (West 1998); *Chicago Flood*, 176 Ill. 2d at 193-94. As this court has previously explained:

> " 'Official action is judicial where it is the result of judgment or discretion. Official duty is ministerial, when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion.' " *Chicago Flood*, 176 Ill. 2d at 194, quoting *City of Chicago v. Seban*, 165 Ill. 371, 377-78 (1897).

We have never held, however, that the grant or denial of a zoning petition is a ministerial, as opposed to a discretionary, task under a tort theory of liability. Therefore, CDG's argument is misplaced. Moreover, section 2—104 plainly grants immunity for injury caused by the "denial [of] any *permit*" and is, therefore, controlling. (Emphasis added.) 745 ILCS 10/2—104 (West 1998).

In addition, if there were a "theft of [CDG's] opportunity" by the Village, as the appellate court found, that "theft" came in the form of the denial of CDG's petition. That the Village denied CDG's petition is the reason this matter is before us. Such an action by the Village falls squarely within section 2—104 of the Act because the Village and its officials were authorized to either grant or deny CDG's petition for rezoning and site plan approval. Clearly, the legislature did not intend to grant an empty immunity to local public entities when they denied "permits" such as zoning petitions. See *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 541 (1992) ("a court construing the language of a statute will assume that the legislature did not intend to produce an absurd or unjust result"). CDG alleged that it was injured by the denial of the petition; we hold, therefore, that pursuant to the Act the Village is immune from liability for any injury resulting from that denial.

Likewise, the Village is immune from liability for any injury resulting from the mayor's alleged assurance that the project would be approved. Under section 2—106 of the Act, the Village is not liable for an injury "caused by an oral promise or misrepresentation of its employee, *whether or not such promise or misrepresentation is negligent or intentional*." (Emphasis added.) 745 ILCS 10/2—106 (West 1998). And section 2—109 provides that a local public entity is not liable where its employee is not liable. 745 ILCS 10/2—109 (West 1998). CDG claims that, in reliance on its meetings with the Village and the

mayor, it spent a good deal of money and, when the Village denied the petition, it had to cancel its purchase contracts and forfeit some of what it had paid. Section 2—106, however, immunizes the Village from liability for any injury resulting from another's reliance on an employee's oral promises or misrepresentations. 745 ILCS 10/2—106 (West 1998). In fact, that section expressly immunizes the Village even when the promise or misrepresentation is "intentional." 745 ILCS 10/2—106 (West 1998). CDG's tort claim falls within the purview of sections 2—104, 2—106, 2—109, and 2—201 of the Act; therefore, the Village is immune from liability.

CDG's heavy reliance on the opinion of the Appellate Court, Second District, in *River Park, Inc. v. City of Highland Park*, 281 Ill. App. 3d 154 (1996), is misplaced. In *River Park*, the appellate court held that a municipality was *not* shielded from liability for conduct that was "corrupt, malicious, or otherwise undertaken in bad faith" under the immunity granted by section 2—104 of the Act. *River Park*, 281 Ill. App. 3d at 163. However, not only did the court in *River Park* not have the benefit of this court's holdings in *Chicago Flood, Harinek*, and *Henrich*, but the rationale of *River Park* was based on a case that originated *before* the 1970 Constitution. In that decision, *Young v. Hansen*, 118 Ill. App. 2d 1 (1969), the Second District adopted the common law exception of "corrupt or malicious motives" as an exception to the Act. *Young* held that the "immunity afforded by section 2—201—while not expressly referring to the question of malice—extends only to those types of acts not resulting from corrupt or malicious motives." *Young*, 118 Ill. App. 2d at 8. Since then, the Second District has followed the *Young* holding to recognize the "corrupt or malicious motives" exception to other grants of immunity by the Act. See *River Park*, 281 Ill. App. 3d at 163; *Madonna v. Giacobbe*, 190 Ill. App. 3d 859, 868 (1989) (recognizing

corrupt or malicious motives exception to sections 2—103, 2—201, and 2—205); *Idlehour Development Co. v. City of St. Charles*, 88 Ill. App. 3d 47, 52 (1980) (recognizing corrupt or malicious motives exception to sections 2—201 and 2—206 of the Act).

Since 1970, however, the authority of the General Assembly to legislate with regard to governmental immunity has derived directly from the Illinois Constitution. The Constitution was amended to abolish sovereign immunity *"[e]xcept* as the General Assembly may provide by law." (Emphasis added.) Ill. Const. 1970, art. XIII, § 4. "Therefore, the tort liability of a [local public entity] is expressly controlled by constitutional provision *and* legislative prerogative as embodied in the [Act]." (Emphasis added.) *Burdinie*, 139 Ill. 2d at 507. Tort liability of local public entities is no longer controlled by the common law because the adoption of article XIII, section 4, in 1970 wholly displaced the common law doctrines of municipal tort immunity. *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 335-36, 339 (1995) (Freeman, J., specially concurring). See also *Michigan Avenue*, 191 Ill. 2d at 519 (reasoning that the "legislature has the inherent authority to repeal or change the common law and may do away with all or part of it"). Governmental tort immunity has become a matter of statute and the "General Assembly [was made] the ultimate authority in determining whether a unit of local government is immune from tort liability ***." *Burdinie*, 139 Ill. 2d at 510.

*Young* was decided before article XIII, section 4, of the 1970 Constitution; therefore, its rationale of drawing from the common law doctrine of sovereign immunity to interpret the Tort Immunity Act is improper. Moreover, it appears that the constitutional issue was never presented to the appellate court in *River Park*. *Young* and its progeny, including *River Park*, are hereby overruled.

Based on these considerations, we reverse the appel-

late court and affirm the trial court's dismissal of CDG's counterclaim in tort as barred by the Village's sovereign immunity under sections 2—104, 2—106, 2—109, and 2—201 of the Act.

### III. CDG's Counterclaim in Quasi-Contract

In count II, CDG claims that when it filed its rezoning petition and paid the required fee, the Village became obligated to process its petition in good faith. CDG frames it as a claim in "quasi-contract" in order to avail itself of section 2—101 of the Act, which states that the Act does not affect liability based on contract. See 745 ILCS 10/2—101(a) (West 1998).

In an action for "quasi-contract" (or, contract implied in law), a plaintiff asks the court to remedy the fact that the defendant was "unjustly enriched" by imposing a contract. See *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 497 (1992). A quasi-contract exists independent of any agreement or consent of the parties. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 334 (1977) ("The right to recover on a [quasi-contract], although phrased in contract terminology, is not based on an agreement between parties but is an obligation created by law"). In fact, the intention of the parties is entirely disregarded. A quasi-contract, therefore, is "no contract at all," but a "rule of law that requires restitution to the plaintiff of something that came into the defendant's hands but in justice belongs to the plaintiff." D. Dobbs, Dobbs Law of Remedies § 4.2(3), at 580 (2d ed. 1993). Such an action is based on the principle that no one ought to enrich himself unjustly at the expense of another. Liability is based on the principle of unjust enrichment and the contract is the *remedy*.

Because a quasi-contract is "no contract at all" but instead is a remedy based upon the principle of unjust enrichment, it follows that a quasi-contract is not a "contract" for purposes of section 2—101(a) (745 ILCS

10/2—101(a) (West 1998)). Consequently, section 2—101(a), which preserves municipal liability based upon contract, does not apply to CDG's second count for quasi-contract. The appellate court, therefore, erred in finding that the second count of CDG's counterclaim fell within section 2—101(a) and in finding that the Village could be held liable in quasi-contract to process CDG's petition in good faith and according to its usual procedures. Accordingly, we reverse the appellate court and affirm the trial court's dismissal of count II of CDG's counterclaim as barred by the Village's sovereign immunity under sections 2—104, 2—106, 2—109, and 2—201 of the Act. Because we find that count II of CDG's counterclaim was barred by the Village's sovereign immunity, we need not consider whether CDG properly stated a claim in quasi-contract.

## CONCLUSION

For the reasons stated, we reverse the appellate court's holding that CDG's count I in tort could proceed against the Village under the Tort Immunity Act. We also reverse the appellate court's judgment allowing CDG's count II claim in quasi-contract to proceed. We affirm the trial court's dismissal of CDG's counterclaim in tort and quasi-contract.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE McMORROW, concurring in part and dissenting in part:

I am in agreement with the conclusion of the majority that section 2—101(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/2—101(a) (West 1998)), which preserves municipal liability for claims based on "contract," does not contemplate actions for quasi-contract. An action in quasi-contract is a theory of

recovery which is "totally unrelated to traditional concepts of contract law." 42 C.J.S. *Implied Contracts* § 4 (1991); see generally 1 D. Dobbs, Remedies § 4.2(3), at 580 (2d ed. 1993).

I am also in agreement with the majority's analysis of section 2—106 of the Tort Immunity Act (745 ILCS 10/2—106 (West 1998)), which provides that "[a] local public entity is not liable for an injury caused by an oral promise or misrepresentation of its employee, whether or not such promise or misrepresentation is negligent *or intentional.*" (Emphasis added.) 745 ILCS 10/2—106 (West 1998). Because intentional conduct is explicitly immunized in this provision, I concur in the majority's conclusion that the Village of Bloomingdale (Village) is immune from liability for any alleged injuries claimed by CDG Enterprises, Inc. (CDG), in its counterclaim as a result of the assurances made by the Village's mayor that CDG's development project would be approved.

I respectfully dissent, however, from the majority's conclusion that intentional misconduct by a local public entity or employee is also shielded by the provisions contained within section 2—104 of the Tort Immunity Act (745 ILCS 10/2—104 (West 1998)). For the reasons more fully set forth in my separate opinions in *Barnett v. Zion Park District*, 171 Ill. 2d 378, 402-08 (1996) (McMorrow, J., dissenting), *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 213-14 (1997) (McMorrow, J., concurring in part and dissenting in part), *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 354 (1998) (McMorrow, J., concurring in part and dissenting in part), and *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 401-02 (1998) (McMorrow, J., dissenting), I continue to adhere to the view that where the Tort Immunity Act is silent on the question of whether intentional government misconduct is exempt from immunity, it should not be concluded that such silence translates into a positive

intent on the part of the General Assembly to cloak local governmental entities and their employees with unconditional immunity.

The genesis of the instant appeal is the March 1995 filing by CDG of a petition with the Village's planning commission to request the rezoning and annexation of five parcels of property located between the Glendale Golf Course on the west and Medinah Road on the east. CDG had contracted to purchase this land with the intent of developing a residential subdivision consisting of 122 townhomes. In August 1995, the Village's planning commission voted down the project, and in October 1995, the Village's board of trustees denied CDG's rezoning and site plan approval request during a public hearing.

In September 1996, the Village filed a complaint for breach of contract against CDG, alleging that CDG had breached a written "application fee agreement" with the Village in which CDG had promised to pay the costs of the Village's attorney, land planner, engineer and director of legal affairs in conjunction with CDG's application for rezoning and site plan approval. The Village's complaint alleged that CDG had failed to pay the costs owed to the Village pursuant to this written agreement.

CDG answered the Village's complaint and filed a counterclaim against the Village. The circuit court granted the Village's motion to dismiss CDG's counterclaim pursuant to section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 1998)), finding that various provisions of the Tort Immunity Act immunized the Village from CDG's claims. Because this appeal comes before us on review of a section 2—619 dismissal, we must accept as true all well-pleaded facts in CDG's counterclaim, as well as all inferences that can reasonably be drawn in CDG's favor. See *Chicago Teachers Union, Local 1 v. Board of Education of the City of Chicago*, 189 Ill. 2d 200, 206 (2000).

CDG's counterclaim alleges that the Village tortiously interfered with CDG's business expectancy in purchasing the five parcels of land and in developing the intended residential subdivision. According to the counterclaim, prior to negotiating the contracts to acquire the land parcels, representatives of CDG met with the Village's mayor to determine the feasibility of the subdivision project. According to the counterclaim, the mayor assured CDG that the "project would be approved" based upon the Village's desire to encourage further residential development along the Medinah Road corridor. According to CDG, between September 1994 and October 1995, its representatives not only met with various Village officials on numerous occasions to review CDG's development plans, but also appeared before the Village's planning commission several times for public hearings regarding CDG's rezoning and annexation requests. The counterclaim alleges that while the Village was ostensibly reviewing CDG's proposals, sometime during June or July 1995 the "Village formed an internal secret 'task force' to pursue the acquisition and financing" of the Glendale Golf Course. The counterclaim further alleges that certain Village officials "secretly met with non-resident property owners along the Medinah Road corridor in an effort to manufacture opposition" to CDG's development plans, with the goal of "subvert[ing] and manipulat[ing] the public hearing process so as to deprive [CDG] of a fair and impartial hearing so that the Village, or certain developers favored by certain of the Village's officials, could acquire the parcels for which [CDG] was the contract purchaser."

The counterclaim further relates that the Village retained Planning Resources, Inc., as its consultant for land planning and development. According to the counterclaim, at the same time that Planning Resources was reviewing CDG's land plans and petition, the Village had

surreptitiously commissioned Planning Resources "to prepare a redesign of the Glendale Golf Course so as to reconfigure the lay-out of various holes" onto CDG's property. CDG alleges that at no time did any representative of Planning Resources or the Village disclose Planning Resource's dual capacity. The counterclaim further alleges that representatives of Planning Resources "secretly met with the opposition group created by certain of the Village's officials," and that one representative of Planning Resources disclosed to CDG that "she was told by an individual on the Village's board to kill [CDG's] project."

According to CDG's counterclaim, during the August 15, 1996, meeting of the Village's planning commission at which time CDG's petition was declined, one commissioner "voiced objection over the fact that the chairman of the Village's planning commission had contacted him at home to discuss [CDG's] pending petition," while a second commissioner objected to the fact that "the chairman, prior to the commencement of the hearing, had circulated a preprinted motion to deny [CDG's] project." According to the counterclaim, these two members of the planning commission filed a "minority report" setting forth the improper acts of the chairman of the Village's planning commission.

CDG's counterclaim further alleges that after the October 23, 1995, public hearing during which the Village's board of trustees voted against CDG's petition, "the Village made public its intention to acquire the Glendale Golf Course by public referendum." Soon thereafter, CDG alleges, the Village successfully acquired the golf course. CDG's counterclaim further alleges that subsequent to the denial of its proposals, at least one of the five land parcels was "purchased by individuals closely aligned with certain of the Village's officials."

In its counterclaim, CDG asserts that its petition met

all of the Village's requirements for rezoning and annexation; that CDG took all the action the Village required; that CDG had incurred costs in reliance on its meetings with the Village while Village officials were "secretly working to sabotage the public hearing process and [CDG's] development efforts"; and that after the Village denied its petition, CDG was required to cancel the purchase contracts and forfeit some of the monies which had been paid.

The counterclaim filed by CDG asserts that, based upon the foregoing facts, the Village "wilfully and with a conscious disregard for the rights of [CDG], purposefully and with the intent to prevent [CDG] from obtaining its rezoning, annexation and development," engaged in a course of conduct which "was unreasonable, arbitrary and capricious," constituted a "deviation from the standard of usual and customary zoning authority procedures," and was "designed to subvert the public hearing process so as to predetermine the outcome." CDG contends in its counterclaim that this course of conduct was entered into for "improper governmental purposes" and "specifically designed to deprive [CDG] of its reasonable business expectancy." CDG requested damages in the amount of $4.8 million, the expected amount of gross profits from its development plans.

The majority affirms the circuit court's dismissal of CDG's counterclaim on the basis that the Village is immunized from CDG's claims pursuant to several provisions of the Tort Immunity Act. I disagree with the majority's holding that CDG's counterclaim is barred by section 2—104 of the Act (745 ILCS 10/2—104 (West 1998)). The majority arrives at this conclusion based on a rationale first employed by this court in *Barnett v. Zion Park District*, 171 Ill. 2d 378 (1996). In *Barnett*, this court held that section 3—108(a) of the Act (745 ILCS 10/3—108(a) (West 1992)) cloaked the defendant park district

with absolute immunity against allegations that the defendant's swimming pool lifeguards knowingly and willfully ignored pleas to help a drowning minor, thereby causing the minor's death. The *Barnett* majority reasoned that the absence of an explicit exception for willful and wanton misconduct in section 3—108(a) of the Act meant that "the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct." *Barnett*, 171 Ill. 2d at 391-92. In the course of my dissent from the majority's holding in *Barnett*, I observed that there "are strong reasons why the policies underlying grants of immunity for simple negligence should not be impliedly expanded to reach willful and wanton or intentional misconduct." *Barnett*, 171 Ill. 2d at 403 (McMorrow, J., dissenting).

More specifically, I explained that "[t]he general rationale for granting public entities the protection of immunities not enjoyed by private entities is the significant expense and burdens placed upon the government" when negligence on the part of local public entities or officials carrying out their government duties results in injuries to the public and such negligence lawsuits "are permitted to flourish unchecked." *Barnett*, 171 Ill. 2d at 403-04 (McMorrow, J., dissenting). It was my view, however, that the "rationale underlying a grant of immunity for simple negligence is different in kind from any justification for immunizing tortious conduct that is intentionally harmful or willful and wanton," and if the legislature actually intended to bestow absolute immunity for willful and wanton misconduct, the immunity statute should positively and unequivocally state such an intention. *Barnett*, 171 Ill. 2d at 404 (McMorrow, J., dissenting).

Since *Barnett*, I have adhered to my belief that the policies underlying grants of immunity for simple negligence are distinguishable from any justification for blanketing deliberate governmental misconduct with im-

munity. See *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 213-14 (1997) (McMorrow, J., concurring in part and dissenting in part); *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 354 (1998) (McMorrow, J., concurring in part and dissenting in part); *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 401-02 (McMorrow, J., dissenting). I note that my conclusion in *Barnett* that the legislature did not intend to immunize willful and wanton misconduct in the immunity provisions of section 3—108 was validated when the General Assembly passed Public Act 90—805 (Pub. Act 90—805, eff. December 2, 1998), which amended section 3—108 to exclude willful and wanton conduct from the immunity granted by the statute. My conviction remains strong that deliberate acts of governmental misconduct, such as those alleged by CDG in the instant cause, are not shielded under the Tort Immunity Act by provisions which remain silent with respect to an express exemption for such intentional bad acts.

In the matter at bar, the majority, based upon the *Barnett* rationale, interprets section 2—104 of the Act (745 ILCS 10/2—104 (West 1998)) as affording a local governmental entity absolute immunity against liability for an "injury" caused by a denial of "any permit" because this section does not contain an express exemption for willful and wanton misconduct or for corrupt and malicious motives. In order to fit CDG's counterclaim within the purview of section 2—104, the majority narrowly construes CDG's allegations as a complaint against the Village's denial of its rezoning, annexation and site development petition. As the appellate court correctly held below, CDG's counterclaim complains of more than the mere denial of its petition by the Village. 314 Ill. App. 3d at 214. CDG alleges that the Village deliberately, maliciously and willfully pursued a course of conduct and abused its governmental powers in an effort to deprive

CDG of expected benefits and appropriate those benefits to itself and its favored developers. Specific allegations in the counterclaim, which must be taken as true, state that while the Village and its officials gave the appearance that CDG's development and annexation requests were being validly processed, the Village secretly formed opposition groups against CDG's plans and had commissioned the Village's own land planning consultant to work in a dual capacity with respect to CDG. In addition, CDG alleged that the chairman of the Village's land planning commission had attempted to improperly influence the votes of the land planning commissioners against CDG. Blanket immunity should not be afforded to acts, such as those alleged by CDG, which are performed by local governmental entities or government officials in bad faith or out of corrupt and malicious motives.

In support of its conclusion that the Village is afforded absolute immunity against the allegations of CDG, the majority asserts that "[c]learly, the legislature did not intend to grant an empty immunity to local public entities when they denied 'permits' such as zoning petitions," and that construing section 2—104 in a contrary manner would lead to an absurd result. 196 Ill. 2d at 497. I disagree. It is evident to me that the blanket, unlimited immunity bestowed upon the Village in this case is unnecessary to protect public entities from liability arising from "the operation of government," which is the stated purpose of the Tort Immunity Act (745 ILCS 10/1—101.1 (West 1998)). Construing section 2—104 of the Act to immunize only negligent conduct would completely fulfill this legislative objective.[1]

---

[1]In passing, the majority opinion also indicates that the allegations of CDG's counterclaim are barred by section 2—201 of the Act (745 ILCS 10/2—201(West 1998)), which provides, *inter alia*, that a public official serving in a position involving the

For the reasons stated, I dissent in part from the opinion of the majority.

exercise of discretion is not liable for injuries resulting from an exercise of that discretion. However, in the instant cause, the majority never actually applies section 2—201 as part of its analysis, instead characterizing as "misplaced" CDG's argument that the process of considering a zoning petition is ministerial. Nevertheless, I reiterate my view, explained in my dissent in *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 214 (McMorrow, J., concurring in part and dissenting in part), that because "good faith is a component of discretionary immunity," section 2—201 does not immunize willful and wanton misconduct.