No. 2--03--1118

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

KEVIN'S TOWING, INC., )   Appeal from the Circuit Court

)   of Lake County.

Plaintiff-Appellant, )

)

v. )   No. 01--L--747

)

BETTE THOMAS and THE CITY OF NORTH )

CHICAGO, )   Honorable

)   John R. Goshgarian,

Defendant-Appellees. )   Judge, Presiding.

______________________________________________________________________________

JUSTICE GROMETER delivered the opinion of the court:

Plaintiff, Kevin's Towing, Inc., filed a complaint against defendants, Bette Thomas and the City of North Chicago
, alleging that defendants interfered with a towing contract between plaintiff and Edward Hines Lumber Company
 (Hines).  The trial court granted summary judgment in defendants' favor on the basis that defendants were entitled to discretionary immunity under section 2--201 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/2--201
 (West 2000)).  We affirm.

The present dispute began on Saturday, June 30, 2001, when p
laintiff 
towed a number of unauthorized cars from Hines' parking lot
 in the City of North Chicago (City) and took them to plaintiff's storage lot in Waukegan
.  Plaintiff originally had a written towing contract with North Chicago Lumber, the predecessor to Hines, and Hines had continued the relationship under the same terms.  The Hines lot is located near the entrance to the Great Lakes Naval Base, which was holding a Fourth of July celebration.  When the celebration ended and the vehicle owners returned to the lot, they discovered that their cars had been towed.  The vehicle owners were informed that their automobiles had been transported to plaintiff's facility in Waukegan but that they could not retrieve them that night.  Eventually, the North Chicago police department and Bette Thomas, the City's mayor, were notified.  Mayor Thomas went to Hines' lot to see if she could resolve the situation.

Mayor Thomas testified in her deposition that when she arrived at the lot, she encountered about 15 people, including angry adults and crying children.  It was chaotic, with people cursing and screaming.  At that time, Mayor Thomas did not know anything about the lot, including whether the lot was public or private, who owned the lot, or who had towed the cars.

Kelly Breneisen, plaintiff's employee, testified in her deposition that she 
was instructed by plaintiff's dispatch service to contact the police.  The North Chicago police department, in turn, advised Breneisen to call the mayor.  Mayor Thomas asked Breneisen to allow a pastor to retrieve church keys from his car because he needed them to open the church the next day.  
Breneisen refused, saying that it was dangerous to release cars at night.  The mayor seemed to understand.  
However, in a subsequent conversation, the mayor angrily demanded that plaintiff release all the vehicles but then calmed down and again asked for just the pastor's keys.  Breneisen told Mayor Thomas that she could bring the pastor to plaintiff's facility but that a police officer should be present for everyone's safety.  Breneisen dispatched driver Fred Schultz to the office to release the pastor's keys.

Mayor Thomas had all of the vehicle owners and passengers transported in City vehicles to plaintiff's office in Waukegan.  She testified that she did so because she felt bad for the families and did not want them to feel that the City was at fault.  Mayor Thomas was also concerned that the incident would generate bad publicity for the City.  Mayor Thomas felt that she should get the families out of the City and take them to where their cars were.

Schultz testified in his deposition that when he arrived at plaintiff's office, he saw between 25 and 30 people standing around the office lot.  People demanded their cars, and Schultz felt threatened.  Mayor Thomas introduced herself to Schultz and became "belligerent and demandatory [
sic
] and very aggressive and outspoken."  She demanded that plaintiff release all of the vehicles, saying that "Kevin has got a real racket going here" and should not be towing in the City because plaintiff did not have a facility there.  She also said that she would do everything in her power, including contacting her attorneys, to ensure that plaintiff did not tow from the Hines lot again.  Waukegan police 
officers arrived, and they negotiated the release of all of the towed vehicles.

Mayor Thomas testified that she
 felt that plaintiff's employees treated her without respect.  She was not angry at plaintiff but was angry and "a little annoyed" with one of plaintiff's employees because the employee was not contacting someone with authority to release the cars.

According to Kevin DePerte, plaintiff's owner, he learned of the June 30 incident on July 2, 2001
.  He called Mayor Thomas that day.  Mayor Thomas "promised" that plaintiff would lose its towing contract with Hines, and she said that she would attack plaintiff in a City newsletter.  Mayor Thomas said that she was "not done with Kevin's yet," and when DePerte began to respond to her statements, she hung up
.

The mayor approved an editorial in the City newsletter, criticizing plaintiff.  The editorial asked citizens to call city hall if they had any complaints about plaintiff, but no one called to complain.  Mayor Thomas asked City officials to check if the Hines lot was in compliance with the City code, and the City issued a citation to Hines due to the lot's condition.  Mayor Thomas also arranged to have a meeting with Hines' representatives.

According to Robert Long
, a City attorney, the mayor asked if she had the right to force Hines to get a different towing company.  Long told Mayor Thomas that she could not force Hines to do so but that, at the meeting, 
the City would try to negotiate 
with Hines to obtain a towing company whose owner the City could contact in the middle of the night.

The meeting took place on August 14, 2001.  In attendance were the mayor, Long, three other City officials, two Hines employees, and Hy Addison, Hines' corporate attorney.  Mayor Thomas testified that the purpose of the meeting was to see if the lot was in compliance with City ordinances.  Addison believed that the purpose of the meeting was to have Hines terminate its relationship with plaintiff.

At the meeting, City officials discussed zoning, licensing, and other matters related to the parking lot, including the June 30 incident.  According to Addison, the meeting was cordial and all of the issues mentioned were legitimate City concerns that were within the City's authority to look into and discuss.  Addison also felt that City officials were explicit about their desire to have Hines end their relationship with Kevin's, in part because the City was raising many issues that Hines could be forced to resolve.  Mayor Thomas testified that she did not request that Hines end its relationship with plaintiff, but she did say that it would be a good idea if Hines considered a local towing company so that if another incident occurred, the City would be able to contact the company's owner and resolve the situation.  The City provided Hines with the names of three local towing companies.  
 Hines had previously been satisfied with plaintiff's work and had no intention of ending the relationship.  However, as a direct result of the meeting
, Addison 
terminated the contract 
because he wanted "to make the City of North Chicago happy."  Hines then contracted with All Star Towing, a local towing company.  The City did not raise the zoning, licensing, or other matters related to the lot again.

The owners of All Star Towing had assisted Mayor Thomas in her mayoral campaign by putting up signs, making telephone calls, and handing out leaflets.  All Star Towing was a new business when Mayor Thomas took office, and she helped the owners get a towing license and obtain City business.  The company's weekend office hours are 8 a.m. to noon on Saturday; it is closed on Sunday
.  Due to safety concerns, the cars towed by All Star Towing may be picked up only during office hours.  The company has deviated from this policy on numerous occasions.

After Hines terminated its relationship with plaintiff,
 plaintiff filed suit against defendants.  Plaintiff's third amended complaint alleged tortious interference with contract (count I) and abuse of governmental power (count II).  Defendants moved for summary judgment, on count I based on immunity from suit under section 2--201 of the Tort Immunity Act
, and on count II on the ground that plaintiff did not have a protectable property interest.  The trial court granted the motion, and plaintiff timely appealed.

On appeal, plaintiff contests the trial court's grant of summary judgment on count I only.  Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 2002).  
We review 
de novo
 a grant of summary judgment
.  
Shannon v. Boise Cascade Corp.
, 208 Ill. 2d 517, 524 (2004).

The Tort Immunity Act's purpose is 
to protect local public entities and public employees from liability arising from the operation of government
.  
745 ILCS 10/1--101.1 (West 2000).  In promulgating the Tort Immunity Act, the legislature "sought to prevent the dissipation of public funds on damage awards in tort cases."  
Van Meter v. Darien Park District
, 207 Ill. 2d 359, 368 (2003).  
Our primary goal in construing a statute is to ascertain and give effect to the legislature's intent, and we will not depart from a statute's plain language by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent.  
Harrison v. Harden County Community Unit School District No. 1
, 197 Ill. 2d 466, 471-72 (2001). 
 The immunity afforded under the Act is an affirmative defense that is the defendant's burden to establish.  
People ex rel. Birkett v. City of Chicago
, 325 Ill. App. 3d 196, 203 (2001).  If an immunity does not apply, a municipality is liable in tort to the same extent as a private party.  
Van Meter
, 207 Ill. 2d at 368-69.

In their motion for summary judgment, defendants claimed that they were immune from liability on count I under section 2--201 of the Tort Immunity Act.  That section states:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."  745 ILCS 10/2--201 (West 2000).

This immunity also extends to a local public entity, as the entity is not liable for an employee's actions when the employee is immune
.  745 ILCS 10/2--109 (West 2000).  For section 2--201 to apply, the employee's position may involve either determining policy or exercising discretion.  
Arteman v. Clinton Community Unit School District No. 15
, 198 Ill. 2d 475, 484 (2002).  However, the employee's act or omission leading to the alleged injury must be both a policy determination and an exercise of discretion.  
Arteman
, 198 Ill. 2d at 484.  We discuss these requirements at length later in our decision.

Citing 
Harrison
, 197 Ill. 2d 466, p
laintiff first argues that section 2--201 has a good-faith requirement.  In 
Harrison
, the supreme court stated that the immunity granted by the Tort Immunity Act to public officials is "premised upon the idea that such officials should be allowed to exercise their judgment in rendering decisions without fear that a 
good-faith
 mistake might subject them to liability."  (Emphasis added.)  
Harrison
, 197 Ill. 2d at 472.

We disagree with plaintiff's argument.  In 
Harrison
, the supreme court did not expressly hold that section 2--201 requires that a decision be made in good faith.  If fact, the supreme court recognized that rules of statutory construction require a court to interpret a statute's plain language and not read into it exceptions, limitations, or conditions that conflict with the express legislative intent.  
Harrison
, 197 Ill. 2d at 471-72. 
 Just a few months before it issued the 
Harrison
 decision, the supreme court held that the Tort Immunity Act contains no exception for "corrupt or malicious motives."  
Village of Bloomingdale v. CDG Enterprises, Inc.
, 196 Ill. 2d 484, 486 (2001).  As such, section 2--201 does not require that the act be done in good faith.

As 
CDG Enterprises, Inc.
 is highly relevant to this case, we examine it in more detail.  There, CDG petitioned the planning commission for the Village of Bloomingdale to annex and rezone five parcels of land so that CDG could build a subdivision.  The village denied the petition and sued CDG for payment for services.  CDG counterclaimed for tortious interference with business expectancy and recovery under quasi-contract.  CDG alleged that although village officials repeatedly met with CDG and said that its project would be approved, the village secretly pursued the acquisition and development of a golf course adjacent to the parcels, prepared a plan to redesign the golf course so that some of the holes would be on the parcels, and met with other individuals to create opposition to CDG's plan.  CDG also alleged that an individual who later bought one of the parcels had connections to certain village officials.  
CDG Enterprises, Inc.
, 196 Ill. 2d at 486-87.

The trial court dismissed CDG's counterclaim, ruling that it was barred by the Tort Immunity Act.  The appellate court reversed, holding that the Act's immunities were limited by the common-law exception for "corrupt or malicious motives."  
CDG Enterprises, Inc.
, 196 Ill. 2d at 488-89.  
The supreme court reversed the appellate court, holding that the Act's plain language prohibited the creation of such an exception.  It noted that throughout the Act, 
the legislature had recognized exceptions to immunity for willful and wanton misconduct, and the court reasoned that if the legislature had intended to create an exception for "corrupt or malicious motives," it would have expressly stated so.  
CDG Enterprises, Inc.
, 196 Ill. 2d at 493-95.  The supreme court also held that the appellate court ignored the language of section 2--104 of the Act  (745 ILCS 10/2--104 (West 1998)), which immunizes a local public entity from liability for injury caused by the denial of a permit.  
CDG Enterprises, Inc.
, 196 Ill. 2d at 495. 
Although CDG claimed that it was really challenging the process by which the petition was denied, the supreme court stated that it was irrelevant whether "the Village denied the petition through an 'abuse of official process and power,' through 'corrupt and malicious misuse of power,' or for 'corrupt or malicious motives,' " because section 2--104 contained no reference to intent.  
CDG Enterprises, Inc.
, 196 Ill. 2d at 495-96.

Plaintiff argues that the holding in 
CDG Enterprises, Inc.
 is limited to section 2--104 of the Act (745 ILCS 10/2--104 (West 2000)) and that any mention of section 2--201 is 
dicta
. We disagree, as the supreme court specifically stated that section 2--201 was at issue in the case (
CDG Enterprises, Inc.
, 196 Ill. 2d at 492), discussed section 2--201 throughout the case, and held that it was affirming "the trial court's dismissal of CDG's counterclaim in tort as barred by the Village's sovereign immunity under sections 2--104, 2--106, 2--109, and 
2--201
 of the Act" (emphasis added) (
CDG Enterprises, Inc.
, 196 Ill. 2d at 500
).  Plaintiff also 
attempts to distinguish 
CDG Enterprises, Inc.
 by stating that  the village acted for its own benefit without regard to the impact on CDG, whereas in this case Mayor Thomas specifically intended to harm plaintiff.  However, CDG never alleged that the village benefitted from its conduct (
CDG Enterprises, Inc.
, 196 Ill. 2d at 488), and the supreme court held that the Tort Immunity Act immunized the village even if it had "corrupt or malicious motives" for denying the petition.  
CDG Enterprises, Inc.
, 196 Ill. 2d at 495-96.  We also note that section 2--201 contains no exception to immunity for willful and wanton misconduct (
Harinek v. 161 North Clark Street Ltd. Partnership
, 181 Ill. 2d 335, 347 (1998)), which is defined under the Act 
as "actual or deliberate 
intention to cause harm
 *** or conscious disregard for the safety of others or their property" (emphasis added) (745 ILCS 10/1--210 (West 2000)).

Plaintiff next argues that Mayor Thomas's act of asking Hines to use a local towing company is not protected by section 2--201 because it was not discretionary.  While the negligent performance of discretionary duties cannot subject a municipality to tort liability, the negligent performance of ministerial duties can.  
Harrison
, 197 Ill. 2d at 472.  Discretionary acts are "those which are unique to a particular public office," whereas ministerial acts are "those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act."  
Snyder v. Curran Township
, 167 Ill. 2d 466, 474 (1995) (township's duty to place warning sign in conformity with law was a ministerial duty); see also 
Harinek
, 181 Ill. 2d 335 (fire marshal's instruction to individual to stand near a door during fire drill was discretionary because he had discretion in determining how, where, and when to hold drill and was under no legal mandate to perform duties in prescribed manner); 
In re Chicago Flood Litigation
, 176 Ill. 2d 179, 195 (1997) (city's supervisory power over dredging company's pile driving was discretionary because city had broad discretion in choosing where to locate piling).  There is no precise formula for classifying an act as either discretionary or ministerial, so the determination must be made in light of the facts and circumstances of each case.  
Snyder
, 167 Ill. 2d at 474.

Plaintiff claims that the mayor's act was not discretionary, because "retaliation and intent to harm are not unique to the office of Mayor, nor to any public office." 
 Plaintiff further maintains that whether the mayor's act was discretionary is a question of fact to be decided by a jury, which could find 
that the mayor's sole motivation was to harm plaintiff. 
 
However, categorizing actions as non-discretionary solely based on an employee's intent would conflict with the supreme court's rulings that section 2--201 immunity is not limited by willful and wanton conduct (
Harinek
, 181 Ill. 2d at 347) 
or "corrupt or malicious motives" (
CDG Enterprises, Inc.
, 196 Ill. 2d at 493-95). 
 As such, even if the trier of fact determined that the mayor acted maliciously, that would not preclude immunity under section 2--201.  Indeed, for the purposes of summary judgment, we assume the allegations of the complaint are true.  
Therefore, we agree with defendants that we must look primarily
 at the mayor's conduct itself, rather than the intent behind it, in determining whether it is protected by section 2--201.  
Cf.
 
Courson v. Danville School District No. 118
, 301 Ill. App. 3d 752 (1998) (
Courson I
) (grant of summary judgment based on section 2--201 immunity reversed because shop teacher had not been deposed, and factual questions existed as to whether his removal of a table saw's safety shield was a discretionary decision or negligence).  
Plaintiff alleged that Mayor Thomas, in her official capacity, asked Hines to use a local towing service.  We conclude that the act was discretionary because it is clear that Mayor Thomas was not following a set policy in a routine manner.

Plaintiff further argues that section 2--201 is not applicable because the conduct did not involve a policy decision.  As discussed, a public employee's act must be both discretionary and a policy determination for section 2--201 to apply.  
Arteman
, 198 Ill. 2d at 484.  
"Policy decisions" are "decisions requiring a governmental entity to balance competing interests and to make a judgment call as to what solution will best serve those interests."  
Van Meter
, 207 Ill. 2d at 379.  Illinois courts have applied this definition to a wide range of situations.  A fire marshal's instruction to an individual to stand near a door during a fire drill was a policy decision because the marshal had to balance the various interests competing for the fire department's time and resources, including the interests of efficiency and safety, in planning and conducting the drill.  
Harinek
, 181 Ill. 2d at 342
.  Similarly, a shop teacher's decision to remove a table saw's safety shield was a policy determination because the teacher was charged with balancing various interests that competed for the class's time and resources, including the interests of efficiency and safety, and he made a judgment call as to how best to perform his teaching duties
.  
Courson v. Danville School District No. 118
, 333 Ill. App. 3d 86, 91 (2002) (
Courson II
), 
appeal allowed
, 202 Ill. 2d 600 (2002).  Workers filling potholes were engaged in policy decisions because they allocated their time and resources among the various potholes to be repaired
 (
Wrobel v. City of Chicago
, 318 Ill. App. 3d 390, 395 (2000)), and 
a principal's denial of a student's request to leave school early due to bad weather was a policy decision because it involved balancing the student's interest with the school's interest in an orderly dismissal (
Harrison
, 197 Ill. 2d at 474)
.

Plaintiff argues that unlike the cases discussed above, Mayor Thomas did not balance competing interests or make a judgment call, because she was imposing her own agenda of retaliation and intent to harm.  Again, such an argument is untenable given that section 2--201 has no exceptions for willful and wanton conduct (
Harinek
, 181 Ill. 2d at 347) 
or "corrupt or malicious motives" (
CDG Enterprises, Inc.
, 196 Ill. 2d at 493-95).
  Besides malicious intent, plaintiff offers no argument as to why the mayor's act of asking Hines to use a local towing company 
was not a policy decision.  The mayor's conduct ostensibly involved balancing Hines' interest in not having unauthorized cars on its property and the City's interest in not having a repeat of the June 30 situation.  Furthermore, as with the fire marshal in 
Harinek
, the shop teacher in 
Courson II
, and the workers repairing potholes in 
Wrobel
, Mayor Thomas had to allocate her time and resources among a multitude of concerns, which in her position involved constituent and City issues.  
Accordingly, we conclude that defendants are immune from plaintiff's claim under section 2--201.  While this result may seem harsh, we have interpreted the statute's plain language, and it is the legislature's prerogative to determine the scope of discretionary immunity.  See 
Arteman
, 198 Ill. 2d at 487-88.

Finally, plaintiff argues that Mayor Thomas specifically denied the facts upon which defendants base their immunity claim.  According to plaintiff, Mayor Thomas testified, " 'I wasn't mad at Kevin's Towing or Kevin's.  I didn't even hint at that meeting with Hines that they should get a different tower.  It is not my contention in this litigation that I had the right to get Hines to change towing companies.  I am not contending that.' "  The portions of Mayor Thomas's deposition that are included in the record on appeal do not actually include such a quote, nor does the pleading that plaintiff cited for this quotation.  In any event, anger toward plaintiff is certainly not necessary for immunity under section 2--201.  Additionally, while Mayor Thomas denied that she asked Hines to terminate its relationship with plaintiff or that she had a legal right to do so, she also explained that she "did suggest" that Hines consider a local towing company so that if another incident occurred, the City would be able to contact the company's owner and resolve the situation.  As such, Mayor Thomas did not deny the facts upon which defendants base their immunity claim.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

Affirmed.

McLAREN and HUTCHINSON, JJ., concur.